**FIRST DIVISION
PHIPPS, C. J.,
ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**December 16, 2014**

# In the Court of Appeals of Georgia

A14A1814. McNAIR v. THE STATE.                                    JE-065C

ELLINGTON, Presiding Judge.

A Richmond County jury found Darrell McNair guilty of four counts of armed robbery, OCGA § 16-8-41 (a); and four counts of possessing a firearm during the commission of a crime, OCGA § 16-11-106 (b). McNair appeals from the denial of his motion for a new trial. He argues that the trial court erred in admitting certain evidence and in failing to give the jury a limiting instruction. He also contends the court erred in denying his motion for a new trial on his claim of ineffective assistance of counsel. Finding no reversible error, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the record shows the following. During the Spring of 2012, the Augusta Police Department investigated a series of armed robberies that they discovered were related. The first occurred on March 25, 2012, when William Moody and Saxon Washington were robbed at gunpoint. Moody testified that he and Washington were standing in the driveway of Washington's Richmond County home, repairing a car. Moody noticed a gray Pontiac Grand Am parked a short distance away and suspected that the occupants, two men and a woman, were watching them. Shortly thereafter, the woman drove the Pontiac away and the two men walked up and asked them for marijuana. One of the men pulled a gun from his waistband, pointed it at Moody, and demanded money. The other man searched the victims' pockets. The men took Washington's wallet and about $480 from Moody. Moody called the police, who responded quickly. Although the police were unable to locate the robbers, they found Washington's wallet in the street a short distance away. Moody speculated that the robbers had escaped in the car he had seen earlier. In their report, the police noted the victims' description of the car and of the robbers, including that one of them had distinctive facial tattoos.

---

[1] See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

The second incident occurred on March 27, 2012. As Andrew Blair was walking across a parking lot to a convenience store, he observed a gray Pontiac Grand Am parked near him. Three men got out of the car, and one asked him for some "weed." When Blair noticed that the men were all armed with handguns, he ran. The men chased and caught Blair, and they took his cell phone.[2] Afraid he was going to be shot, Blair struggled free and ran to the convenience store. A store employee called the police, who responded immediately. Blair showed a responding officer the gray Pontiac, which was still parked in the lot, and the police impounded it. In the back seat of the car, the police found a bullet and a mask.

An investigator determined that the car belonged to Willie McNair, a cousin of the appellant. The investigator testified that he interviewed the cousin and that the cousin told him that he had loaned his car to Andrew Dunn and that the car had been stolen while in Dunn's possession. The investigator recorded his interview with the appellant's cousin and the recording was played for the jury at trial. The State also offered the testimony of an Assistant District Attorney ("ADA") who interviewed the cousin before trial. The ADA testified that, during his interview, the cousin told him

---

[2] Only McNair's co-defendant, Andrew Dunn, was indicted for this offense.

that he had rented his car to Dunn *and* McNair. The cousin also told the ADA that McNair was the one who had informed him that his car had been stolen.

The third incident occurred on April 8, 2012. Sharome Simmons and Lafayette Yarbray were walking along a Richmond County street when two men on bicycles rode up to them. One man tried to snatch a gold chain from Simmons' neck while the other demanded money and threatened to shoot them with a handgun. Simmons gave the men his necklace and Yarbray surrendered over $300 in cash. The robbers then fled on their bicycles, and Yarbray, Simmons, and a deputy who had been dispatched to the area on a "shots fired" call, each independently pursued them. The deputy caught the robbers, whom he identified as Dunn and McNair, and detained them in a patrol car. Yarbray and Simmons approached the deputy and told him that the men in his custody had just robbed them. The deputy searched Dunn and McNair and found $180 in Dunn's pockets, $202 in McNair's pockets, and Simmons' gold chain on the floorboard of the patrol car at McNair's feet. Both Yarbray and Simmons identified McNair and Dunn at trial. The State also presented the testimony of a witness who, on April 8, had seen two men hiding from the deputy on her carport. The witness found a handgun near where the men had been hiding and called the police to retrieve it.

Based on information gleaned from the second and third incidents, investigators prepared photographic line-ups containing images of Dunn and the appellant to show to Blair, Moody, and Washington. Blair positively identified Dunn from the line-up and later at trial. Moody identified McNair and Dunn from the photographic line-ups and also later at trial.[3] Moody also identified from a photograph the impounded Pontiac he had seen just before the robbery. And, finally, the handgun recovered during the third incident matched the one that Moody described to the police as having been used against him.

1. In related claims of error, McNair contends that the trial court erred in admitting into evidence his cousin's statements concerning the allegedly stolen Pontiac Grand Am on the grounds that the statements constituted hearsay that was not admissible for purposes of impeachment. . We disagree.

With respect to these arguments, the record shows the following relevant facts. The prosecution called the cousin to testify about the circumstances surrounding the alleged theft of his car and how the car came to be impounded by the police. However, when the cousin was asked to identify his car, he denied owning it or

---

[3] Washington did not identify anyone from the photographic line ups. The state did not call him as a witness because he died prior to trial.

having rented it to anyone, and he claimed to have no recollection of speaking with the police. The trial court allowed the prosecution to treat the cousin as a hostile witness and to ask him leading questions.[4] When asked about the specific statements[5] that he had made concerning the car during his interviews with investigators, he gave repeated, blanket "I can't recall" responses, asserting that he had no recollection of having spoken with the police or with anyone from the District Attorney's office. On cross-examination by McNair's defense counsel, the cousin claimed that his memory had been impaired by his abuse of illegal drugs. Yet he was able to recall in great detail the circumstances surrounding the five armed robbery indictments pending

---

[4] When a witness demonstrates reluctance to testify about a crime, a trial court has "great latitude to permit the [prosecutor] to treat [the witness] as a hostile witness and propound leading questions." (Citations omitted.) *Knight v. State*, 266 Ga. 47, 49 (4) (b) (464 SE2d 201) (1995). Moreover, "[w]hether leading questions are permitted is within the trial court's discretion, and exercise of that discretion will not be interfered with by the appellate courts unless the discretion is abused." (Citations omitted.) Id. We find no merit to McNair's contention that the court erred in allowing leading questions. .

[5] The prosecutor asked the witness the following questions: "Do you remember telling [the investigator], back on March 28th, 2012, that you did own a silver Pontiac? . . . Do you remember . . . calling to report [the car] stolen? . . . Do you remember . . . identifying Andrew Dunn as the person who had rented your car that night, and the Sunday before? Do you remember talking to some people from the D.A.'s office last fall? . . . You don't remember telling anybody last fall that Darrell McNair was also one of the people that rented your car?"

against him as well as the fact that he had not been given any leniency by the prosecution in exchange for his testimony in the instant case.

After the cousin had been excused, the State introduced, over defense counsel's objections, the testimony of the police investigator who had first interviewed the cousin, the recorded statement the cousin gave the investigator, and the testimony of the ADA who later interviewed the cousin prior to trial. With respect to the recorded statement, McNair objected to it on the ground that the State had failed to lay a proper foundation for its introduction and that he could no longer confront and cross-examine the witness concerning the statement. The appellant also objected to the admission of the ADA's testimony on additional grounds, including that it was improper to allow an ADA involved in the case to testify, that the State could not impeach its own witness, that the statements constituted inadmissible hearsay, and that it was improper to introduce the statements as substantive evidence for the purpose of impeachment.

(a) The record shows that the State laid a proper foundation for the admission of the cousin's out-of-court statements. The evidentiary rules pertaining to examining witnesses on their prior inconsistent statements and using those statements for impeachment purposes or as substantive evidence are currently codified at OCGA §

24-6-613[6] and § 24-8-801 (d) (1) (A).[7] These new evidentiary rules "retain Georgia's [former] approach to a testifying witness's out-of-court statements. Such statements are not hearsay." (Footnote omitted.) See Milich, Georgia's New Evidence Code, 28 Ga. State U. Law Rev. 379, 390 (Winter 2012). Thus, they may be admitted both for impeachment purposes and as substantive evidence. See *Gibbons v. State*, 248 Ga. 858, 862 (286 SE2d 717) (1982) ("[A] prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes.") (decided under former OCGA § 24-9-83).

--------

[6] Because this case was tried after January 1, 2013, Georgia's new Evidence Code applies. See Ga. L. 2011, pp. 99, 214, § 101. Former OCGA § 24-9-83, which provided in relevant part that "[a] witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case[,]" was repealed effective January 1, 2013 and replaced with OCGA § 24-6-613. See Ga. L. 2011, p. 99, § 1; *Jones v. State*, 326 Ga. App. 658 (757 SE2d 261) (2014).

[7] Pursuant to OCGA § 24-8-801 (d) (1) (A), a prior out-of-court statement by a witness

> shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement or a prior consistent statement under Code Section 24-6-613 or is otherwise admissible under this chapter.

Further, contrary to McNair's argument, the prosecutor was not required to show the witness his recorded statements during direct examination to refresh his recollection. OCGA § 24-6-613 (a).[8] Nor was it improper for the prosecutor to impeach his own witness. OCGA § 24-6-607.[9] Moreover, the prosecutor was authorized to present extrinsic evidence of the witness's prior inconsistent statements for impeachment purposes and as substantive evidence, given the facts of this case. OCGA § 24-6-613 (b) provides, in relevant part, that

> [e]xcept as provided in Code Section 24-8-806, extrinsic evidence of a prior inconsistent statement by a witness shall not be admissible unless the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require.

The record shows that the witness testified that he did not own the car at issue and that he did not rent it to anyone – statements inconsistent with those previously given

---

[8] "In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time; provided, however, upon request the same shall be shown or disclosed to opposing counsel." OCGA § 24-6-613 (a).

[9] "The credibility of a witness may be attacked by any party, including the party calling the witness." OCGA § 24-6-607.

9

in the case. Both the prosecutor and defense counsel examined the witness as to each of his prior inconsistent statements. The witness was afforded an opportunity to explain or to deny his prior inconsistent statements, and he chose to explain them by saying that, because of his drug use, he simply had no recollection of making them. Given the State's compliance with the prerequisites of OCGA § 24-6-613 (b), the trial court did not err in admitting extrinsic evidence of the cousin's prior inconsistent statements both for impeachment purposes and as substantive evidence. See *Gibbons v. State*, 248 Ga. at 862.

(b) McNair argues that the prosecutor knew that the cousin was reluctant to testify against McNair, but called him to the stand anyway with the intent of eliciting substantive evidence through his prior inconsistent statements – evidence, he argues, that the law would not otherwise allow, citing *United States v. Gilbert*, 57 F3d 709, 711 (9th Cir. 1995) ("Impeachment is improper when employed as a guise to present substantive evidence to the jury that is otherwise inadmissible.") (citations omitted.) McNair has not shown that the *Gilbert* case is persuasive authority under Georgia law given that, unlike the Federal Rules of Evidence,[10] OCGA § 24-6-613 (b) allows a

[10] Under Federal Rule of Evidence 801 (d) (1) (A), the cousin's statements would have been inadmissible hearsay because they were not made under oath. The federal rule provides, in relevant part, that a prior inconsistent statement of a

10

testifying witness's prior inconsistent statements to be admitted both for impeachment purposes and as substantive evidence, making the prosecutor's intent under the circumstances irrelevant.[11]

(c) McNair argues that the trial court erred in allowing the ADA to testify as to the cousin's prior inconsistent statements because the ADA was a prosecutor handling the case.

"The practice of trial attorneys testifying is not approved by the courts except where made necessary by the circumstances of the case." *Timberlake v. State*, 246 Ga. 488, 500 (7) (271 SE2d 792) (1980). Because allowing an advocate to testify as a "witness poses innumerable threats to the integrity and reliability of the judicial process[,]" *Castell v. Kemp*, 254 Ga. 556, 557 (331 SE2d 528) (1985), courts have often refused to permit a prosecutor to testify as a "witness unless there is a compelling need." (Citations and punctuation omitted.) *United States v. Roberson*,

---

declarant-witness is not hearsay if it "was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." OCGA § 24-8-801 (d) (1) (A) has no such limitation. See footnote 7, supra.

[11] See footnote 7, supra. See also Milich, Georgia's New Evidence Code, 28 Ga. State U. Law Rev. 379, 389-390 (Unlike the federal rules, "Georgia's . . . definition [of hearsay] does not include the out-of-court statements of a testifying witness.") (footnote omitted).

897 F2d 1092, 1098 (IV) (F) (11th Cir. 1990). Whether to allow a prosecutor to testify as a witness in a case is a matter within the discretion of the trial judge. *Timberlake v. State*, 246 Ga. at 501 (7). In this case, however, we need not reach the question of whether the trial court abused its discretion in allowing the ADA to testify because the record shows that the ADA was not acting as a prosecutor in the case.

The record shows that the ADA who testified was not responsible for trying McNair and that his only appearance during the trial of the case (other than as a witness) was to enter the courtroom briefly before jury selection commenced because the prosecutor who actually tried the case had planned to have the ADA assist him with jury selection. He did not question any prospective jurors. When it became clear that the ADA might need to offer testimony in the case,[12] he was removed from the courtroom and was sequestered with the other trial witnesses. Further, defense counsel was notified prior to trial of his status as a potential witness. The record does not support a finding that the ADA was listed as counsel for the trial of the case, nor does the record support an inference that he was present in the courtroom for trial in

[12] The record does not support appellant's assertion that the prosecutor knew that Willie McNair would offer testimony contrary to his prior statements to police. In fact, it is clear from the transcript that neither the prosecutor nor defense counsel knew what the witness intended and they were all equally struggling with how to plan their trial strategy given that uncertainty.

12

a capacity that would lead the jury into believing that he was prosecuting the case. In fact, he testified that the instant case was not assigned to him, and he told the jury: "I have not been a part of preparing this case outside of meeting at the . . . jail [to interview] Willie McNair." Given these facts, McNair has failed to show any impropriety in allowing the ADA to testify.

2. McNair contends that the trial court erred in failing to give the jury "limiting instructions for evidence presented against [McNair's co-defendant]" concerning charges that were unique to the co-defendant. The record does not reflect that McNair requested such a charge in writing, and he concedes that in his appellate brief. The record shows that the trial court suggested a limiting instruction which counsel found acceptable, and that the court gave the jury substantially the same instruction in the final charge of the court.[13] When the court asked if counsel had any objections to the jury charge given, counsel responded in the negative.

---

[13] The court advised the jury as to those charges in the indictment that applied to the co-defendant, to McNair, or to both; further, the court briefly outlined the evidence asserted against each defendant in each charge. The court advised the jury that it must determine the guilt or innocence of each defendant separately. Shortly thereafter, the court charged the jury: "Now, after considering the testimony and evidence presented to you, together with the charge of the Court, you should consider each charge and each defendant individually."

Where, as in this case, "no objection is made to a jury charge at trial, appellate review for plain error is required whenever an appealing party properly asserts an error in jury instructions." (Citation and punctuation omitted.) *Vann v. State*, 294 Ga. 464, 466 (2) (754 SE2d 355) (2014). The "plain error" test authorizes a reversal of a conviction only "if the instruction was erroneous, the error was obvious, the instruction likely affected the outcome of the proceedings, and the error seriously affected the fairness, integrity or public reputation of judicial proceedings." (Citation and punctuation omitted.) Id. In this case, there was no error as the instruction given was neither required nor erroneous. The limiting instruction the court gave may have been, in hindsight, unsatisfactory to McNair, but

> [i]t has long been the rule in this State that [w]hen evidence is admitted for one purpose, as it was in the instant case, it is not error for the court to fail to instruct the jury to limit its consideration to the one purpose for which it is admissible, *in the absence of a request to so instruct the jury*.

(Citations omitted; emphasis original.) *State v. Belt*, 269 Ga. 763, 764 (505 SE2d 1) (1998). See also OCGA § 24-1-105 ("When evidence which is admissible as to one party or for one purpose but which is not admissible as to another party or for another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly.") (emphasis supplied). In this case, not only

14

was there no request, counsel approved of the limiting charge given. Consequently, we find no error in the instruction given and, consequently, no plain error warranting reversal.

3. McNair contends that his defense counsel provided ineffective assistance in the follow respects: He argues that his counsel failed to adequately investigate the case and to call alibi witnesses at trial, that she improperly waived his motion to sever, , that she failed to secure adequate limiting instructions, and that she failed to request limiting instructions restricting evidence of his prior conviction to a proper purpose. For the following reasons, we find no reversible error in the trial court's ruling denying McNair's motion for new trial on this ground.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct.

(Citations and punctuation omitted.) *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003). See *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

"As a general rule, reasonable trial tactics and strategies do not amount to ineffective assistance of counsel." (Citation omitted.) *Woods v. State*, 304 Ga. App. 403, 409 (4) (696 SE2d 411) (2010). "The decisions on which witnesses to call and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his [or her] client." (Citation and punctuation omitted.) *Moreland v. State*, 263 Ga. App. 585, 588 (4) (588 SE2d 785) (2003). "Whether an attorney's trial tactics [were] reasonable is a question of law, not fact." (Citation and punctuation omitted.) Id. "When assessing the reasonableness of counsel's actions, a court must evaluate counsel's performance from his or her perspective at the time of trial." (Citations omitted.) *Woods v. State*, 304 Ga. App. at 409 (4). This Court reviews a trial court's ruling on an ineffective assistance claim on appeal by "accept[ing] the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Robinson v. State*, 277 Ga. at 76.

(a) The record does not support McNair's contention that trial counsel failed to adequately investigate his case and to call alibi witnesses at trial. Counsel testified that she reviewed all of the evidence obtained during discovery, including witness statements and recordings, and she developed several theories of defense, including

16

alibi and misidentification. She interviewed witnesses, including alleged alibi witnesses, and she had them under subpoena for trial. She negotiated a plea offer, which McNair rejected. She filed appropriate discovery motions and filed a motion to sever the co-defendants' trials.

With respect to alibi witnesses, counsel testified that she and McNair jointly made the decision not to call alibi witnesses, primarily for the reason that McNair feared that they might hurt his defense. In fact, it was possible that one of the robbery victims might recognize one of his alibi witnesses as a participant in the first armed robbery. Most of McNair's alleged alibi witnesses were family members, and counsel testified that, although they were under subpoena, they failed to appear when they were due to testify. Counsel testified that she discussed with McNair whether to have the witnesses brought to court. McNair decided that he did not want them, and counsel elected to proceed without them. This was a reasonable trial strategy, and reasonable trial strategy does not constitute deficient performance. See *Moreland v. State*, 263 Ga. App. at 588 (4). Consequently, McNair has failed to show that the trial court erred in denying his motion for a new trial on this basis.

(b) The record does not support McNair's contention that his trial counsel erred when she waived at trial her previously filed motion to sever. Counsel testified that

17

McNair was afraid that, if his trial was severed from Dunn's, Dunn might be more willing to accept a plea bargain in exchange for his testimony against McNair at trial. Dunn had been offered a better plea bargain given that his criminal record was not as serious as McNair's. Counsel only abandoned the severance motion after discussing it with McNair and after learning that he and Dunn wanted to convey a "united front" at trial. The record supports that counsel made a sound, strategic decision to abandon the motion, and reasonable trial strategy does not constitute deficient performance. See id. Consequently, McNair has failed to show that the trial court erred in denying his motion for a new trial on this basis.

(c) Although the record supports McNair's contention that counsel did not make a written request for a limiting instruction concerning evidence applicable only to McNair's co-defendant, the record does support a finding that counsel agreed to the limiting instruction suggested by the trial court, an instruction included in the final charge to the jury. See Division 2, supra. Counsel has not demonstrated that the failure to request a more detailed limiting instruction or to insist that such an instruction be given at the time the evidence was presented constituted error under the circumstances or that it resulted in any prejudice to McNair's defense.

The record reveals that, consistent with their unified defense, McNair testified that he and Dunn were friends, and that they had both been misidentified as participants in the first two robberies after they had been wrongfully arrested as suspects in the third robbery. McNair testified that he and Dunn were victims of the third robbery, and that an unknown person had actually shot Dunn. Distancing himself from Dunn was not part of McNair's trial strategy. Given the nature of McNair's defense, it was not an unreasonable strategy to refrain from requesting more detailed limiting instructions, and reasonable trial strategy does not constitute deficient performance. See *Moreland v. State*, 263 Ga. App. at 588 (4). Consequently, McNair has failed to show that the trial court erred in denying his motion for a new trial on this basis.

(d) Finally, McNair contends that counsel erred in failing to request a limiting instruction pertaining to a prior burglary conviction that the State used to impeach him with during his testimony at trial. The record shows, however, that McNair testified on direct examination that he had been convicted of that burglary when he was 14 years old and that he went to "adult prison" after he violated his probation. As a consequence of that experience, he testified that he learned "to do no more crimes." McNair also testified that he was not allowed to have a handgun. Given that counsel

made preemptive use of McNair's prior conviction, knowing that it would be used to impeach him on cross-examination, demonstrates a reasonable trial strategy. That counsel did not ask for a limiting instruction under these circumstances is consistent with that reasonable strategy, and reasonable trial strategy does not constitute deficient performance. See id. Consequently, McNair has failed to show that the trial court erred in denying his motion for a new trial on this basis.

*Judgment affirmed. Phipps, C. J., and McMillian, J., concur*.