## S16A1342. ROBBINS v. THE STATE.
(793 SE2d 62)

MELTON, Justice.

Following a jury trial, Robert Robbins was found guilty of felony murder, aggravated assault, and aggravated battery in connection with the beating death of his wife, Susan Robbins.[1] On appeal, Robbins contends that the trial court erred in allowing certain statements of the deceased victim to be admitted into evidence at trial and that his trial counsel was ineffective. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence presented at trial revealed that, on the night of February 7, 2011, after drinking a box of wine and a bottle of peppermint schnapps, and taking pain pills, Robbins became enraged about being unable to find his lighter and severely beat his wife, Susan, for an extended period of time with a plank of wood, breaking her nose; fracturing her ribs and wrist; breaking her femur; and causing a collapsed lung, bilateral subdural hematomas, and a subarachnoid brain bleed. At some point during the repeated beatings, Robbins' son

---

[1] On February 22, 2012, Robbins was indicted for malice murder, felony murder predicated on aggravated assault, aggravated assault, and three counts of aggravated battery. Following a May 27-29, 2014 jury trial, Robbins was acquitted of malice murder, but found guilty on all of the remaining counts. On August 18, 2014, the trial court sentenced Robbins to life imprisonment for felony murder and twenty consecutive years for one of the counts of aggravated battery. The remaining counts were merged for sentencing purposes. Robbins filed a motion for new trial with new counsel on August 29, 2014, which he amended on April 20, 2015. Following a May 19, 2015 hearing, the court denied the motion on October 21, 2015. Following the payment of costs, Robbins' timely appeal was docketed in this Court for the April 2016 term and submitted for decision on the briefs.

saw Robbins twist Susan's arm and choke her while she was nearly unconscious on the ground.[2]

After receiving a call from relatives about the domestic dispute between Robbins and Susan the next morning, Susan's niece, Elizabeth Grimes, went to Susan's RV and found Susan sitting on a couch with a broken and bloody nose. Susan was covered in dried blood and was incoherent, which led Grimes to believe that Susan should be taken to the hospital. Susan told Grimes about the beating that she had suffered at the hands of her husband, claiming that Robbins had been drinking boxed wine and peppermint schnapps and taking pain pills all night; that Robbins became angry when he could not find his lighter and then began beating Susan in frustration; and that Robbins continued to beat her intermittently all night. Susan also pointed out to Grimes the plank of wood that Robbins had used to beat her. Susan initially did not want to go to the hospital, but Grimes eventually convinced Susan to go. Robbins' son had to physically help Susan to make it to Grimes' car.

At the hospital, Grimes told police the details about the beating that Susan had told her that morning. However, as the police investigation progressed, Grimes became uncooperative and refused to give a written statement to police. At trial, Grimes consistently denied telling police anything about the beating and instead testified that Susan had told her that her injuries had resulted from a fall from her trailer. Grimes further denied that she had made any of the statements about the beating to the police that Susan had allegedly told her the morning after the beating. However, at trial, a police detective and Susan's daughter testified about all of the statements that Grimes had told to them about the beating that had been conveyed to her by Susan.

While Susan was at the hospital, her condition eventually worsened and she was placed on a ventilator to help her breathe. Susan's doctor informed her that she would need to undergo surgery in order to be able to breathe on her own, and Susan initially agreed to the surgery, but she later changed her mind on the day of the scheduled surgery and decided not to have the surgery. Susan's condition deteriorated, and, after 25 days in the hospital, Susan's daughter placed her in hospice care on March 4, 2011. The next day, Susan died,

---

[2] Robbins' son died before the trial took place in this case. Thus, no eyewitnesses to any of the alleged abuse by Robbins actually testified at trial. The statements about Robbins twisting Susan's arm and choking her came in at trial through the unobjected-to testimony of Susan's daughter, who claimed that Robbins' son had told her these things. See OCGA § 24-8-802 ("[I]f a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible").

succumbing to the injuries that she had suffered as a result of the severe beating that she had received at the hands of Robbins throughout the night on February 7.

When interviewed by police about the night of the alleged beating, Robbins said that he did not know what happened, but he apologized and admitted that he was with Susan at the RV on the night that she suffered her injuries, that he had been angry and frustrated with his wife, and that he had "been under too much stress . . . until [he] broke down."

The evidence was sufficient to enable a rational trier of fact to find Robbins guilty of all of the crimes of which he was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Robbins contends that the trial court erred by admitting into evidence the statements that Susan allegedly made to Grimes on the morning after the beating as either exceptions to the rule against hearsay, see OCGA § 24-8-803 (1) (present sense impressions)[3] and 24-8-803 (2) (excited utterances),[4] or under OCGA § 24-8-801 (d) (1),[5] to impeach Grimes' trial testimony.[6] We disagree.

Pretermitting the question whether Susan's prior statements to Grimes could be admitted into evidence through Grimes' testimony as present sense impressions pursuant to OCGA § 24-8-803 (1), we find that such statements could be properly admitted into evidence as excited utterances under OCGA § 24-8-803 (2). Again, "[a] statement relating to a startling event or condition made while the declarant was *under the stress of excitement caused by the event or condition*" may be admitted into evidence under the excited utterance exception to the rule against hearsay. (Emphasis supplied.) Id. In this regard:

> While the declarant must still be under the stress or excitement that the startling event caused, the excited utterance need not be made contemporaneously to the startling event.

---

[3] Pursuant to OCGA § 24-8-803 (1): "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter . . . shall not be excluded by the hearsay rule."

[4] Pursuant to OCGA § 24-8-803 (2): "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition . . . shall not be excluded by the hearsay rule."

[5] Pursuant to OCGA § 24-8-801 (d) (1) (A): "An out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement or a prior consistent statement under Code Section 24-6-613 or is otherwise admissible under this chapter."

[6] The trial court ruled that the statements could be admitted at trial as original evidence under OCGA § 24-8-803 (1) and (2), or for impeachment purposes.

It is the totality of the circumstances, not simply the length of time that has passed between the event and the statement, that determines whether a hearsay statement was an excited utterance. See *United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (finding a statement was an excited utterance when it was made four hours after the startling event because it is likely that the victim continued to suffer trauma because she was unable to escape the location where the assault occurred); *United States v. Scarpa*, 913 F.2d 993, 1016-17 (2d Cir. 1990) (finding a statement was an excited utterance when it was made five or six hours after the event where the record demonstrated that the declarant was still under stress at the time he made the statement); *Gross v. Greer*, 773 F.2d 116, 119-20 (7th Cir. 1985) (finding that the district court properly admitted a statement made twelve hours after the startling event).

*United States v. Belfast*, 611 F3d 783, 817-818 (VI) (A) (11th Cir. 2010).

Here, the evidence reveals that Grimes arrived at Susan's RV in the morning after Susan had possibly been subjected to a beating that took place throughout the entire night, and Susan was still speaking incoherently from the recent beating that had broken her nose and caused her several other extensive injuries. While the beating itself was not still actively occurring at that moment, Susan was still in the RV where the beating had just taken place, and she did not know if the beatings might begin again. We find no abuse of discretion in the trial court's conclusion that, under the totality of the circumstances, Susan was still suffering under the stress of the all-night beating such that her statements to Grimes were admissible under the excited utterance exception to the rule against hearsay. See *United States v. Belfast*, 611 F3d at 817-818 (VI) (A).

However, because Grimes testified at trial that Susan had only told her that she had received her injuries from falling from her RV, this does not answer the question whether Susan's alleged statements to Grimes about the beating could be properly introduced at trial through the testimony of the investigating police officer and the testimony of Susan's daughter. In this regard, the potential hearsay within hearsay as conveyed through the testimony of the police officer and Susan's daughter must be independently evaluated for admissibility. See OCGA § 24-8-805 ("Hearsay included within hearsay shall not be excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule"). In this connection, the statements that Grimes made to police and Susan's

daughter independently of anything that Susan allegedly told to her would fall within an exception to the rule against hearsay. See OCGA § 24-8-801 (c) (" 'Hearsay' means a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted") and (d) (1) (A) ("An out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement or a prior consistent statement under Code Section 24-6-613 or is otherwise admissible. . . ."). Further, as stated previously, the statements made by Susan to Grimes about the possible beating would be properly admissible under the excited utterance exception to the rule against hearsay. OCGA § 24-8-803 (2).

Because Susan's prior statements to Grimes about the beating fell within an exception to the rule against hearsay, these statements could be used as substantive evidence and to impeach Grimes' testimony at trial in which she denied that Susan ever told her about the beating. *Gibbons v. State*, 248 Ga. 858, 862 (286 SE2d 717) (1982) ("[A] prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes"). See also *McNair v. State*, 330 Ga. App. 478, 482 (1) (a) (767 SE2d 290) (2014), citing *Gibbons*, supra, 248 Ga. at 862 (OCGA §§ 24-6-613 and 24-8-801 (d) (1) (A) of Georgia's new Evidence Code, which "pertain[ ] to examining witnesses on their prior inconsistent statements and using those statements for impeachment purposes or as substantive evidence . . . retain Georgia's (former) approach to a testifying witness's out-of-court statements. Such statements are not hearsay") (citation and punctuation omitted). Indeed, the record reveals that Grimes initially told police that Susan had told her several details about the beating that Susan had suffered at the hands of Robbins and the reason for the beating. Specifically, Susan told Grimes about Robbins' drinking of boxed wine and peppermint schnapps and his consumption of pain pills throughout the night; Robbins' anger at the fact that he could not find his lighter; Robbins' beating of Susan out of his frustration from being unable to find his lighter; and the fact that Robbins continued to beat Susan intermittently all night. Grimes also indicated to Susan's daughter that Susan had pointed out to her the plank of wood that Robbins had used to beat her. However, at trial, Grimes categorically denied that Susan had told her any of these details about the beating or that Susan showed her any piece of wood that had allegedly been used in the beating. Instead, Grimes claimed at trial that Susan had only told her that her injuries had come from

a fall from her RV. Because Grimes specifically denied at trial that Susan had ever told her the very statements that Grimes initially told to police and Susan's daughter that Susan had said to her about the beating, the prior statements from Susan about the circumstances of the beating could be used to impeach Grimes' trial testimony. And, because Susan's statements could be properly admitted into evidence as excited utterances, we find no error in the trial court's admission of those prior statements to Grimes as substantive evidence and for impeachment purposes.

3. Robbins contends that his trial counsel was ineffective for failing to (a) object to the State's presentation of the testimony of the medical examiner in the narrative form, and (b) object to the trial court's responses to the jury's questions during deliberations. We disagree.

> In order to succeed on his claim of ineffective assistance, [Robbins] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SC[t] 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. Id. at 697 (IV); *Fuller v. State*, 277 Ga. 505 (3) (591 SE2d 782) (2004). In reviewing the trial court's decision, " '[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

*Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

(a) Counsel testified at the motion for new trial hearing that he made a strategic decision to allow the State's medical examiner, Dr. Downs, to testify in the narrative form regarding Susan's autopsy. Specifically, counsel had experience with Dr. Downs in past cases, and, based on this past experience, he believed that Dr. Downs was "not a dynamic [witness]," and that Dr. Downs would be less effective if he were "allowed to just sort of ramble on" until the "jury would glaze over and sort of ignore part of what he had to say." We find this strategy to allow Dr. Downs to simply talk without interruption about the nature of Susan's injuries to be reasonable, especially in light of the fact that trial counsel's overall strategy had nothing to do with contesting the cause or extent of Susan's injuries, but was rather tied to the theory

that Robbins did not assault his wife at all — as no one actually saw him commit the alleged crimes. See *Thomas v. State*, 284 Ga. 647, 650 (3) (b) (670 SE2d 421) (2008) ("The decision of how to deal with the presentation of an expert witness by the opposing side . . . is a matter of trial strategy, which, if reasonable cannot be the basis of a successful ineffective assistance of counsel claim") (citations omitted).

(b) During its deliberations, the jury posed three questions to the trial court: (1) "What caused Susan Robbins' death as written in the final medical report?"; (2) "May we have a copy of the medical record provided into evidence?"; and (3) "Was there any medical testimony to suggest that if Susan Robbins had had the surgery on her lungs that she would have lived longer?" In response to the third question, the trial court instructed the jury that it could not answer the question, because it was "up to [the jury] to remember what the evidence was and to form whatever conclusions [it] form[ed] from that." In response to the first two questions, the trial court explained the continuing witness rule[7] to the jury and agreed only to release the short medical discharge summary to the jury that had previously been admitted into evidence. The court declined to release any of the additional medical records to the jury that had been admitted into evidence, explaining to the jury the trial court's belief that the release of such extensive records to the jury would violate the continuing witness rule. Trial counsel agreed with the trial court's approach in responding to the jury's questions.

Robbins contends that counsel was ineffective for failing to object to the trial court's handling of the questions, because counsel was deficient by allowing the trial court to answer the jury's questions in a manner that allegedly encouraged them to weigh the issue of proximate causation in favor of a guilty verdict. However, we find no merit to this assertion. Indeed, as explained in Division 3 (a), supra, trial counsel's strategy had nothing to do with proximate causation, but rested on the idea that Robbins was not the person who had inflicted the injuries upon Susan. The discharge summary did not state who committed the assault, and therefore did not undermine the defense put forth by Robbins. See *Allen v. State*, 293 Ga. 626, 628 (2) (c) (748 SE2d 881) (2013) ("A trial attorney's decision to pursue a

---

[7] In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations. (Citations and punctuation omitted.) *Davis v. State*, 285 Ga. 343, 348 (8) (676 SE2d 215) (2009).

specific defense is reasonable if it is supported by the evidence in the case."). In this connection, regardless of whether the trial court could have properly sent additional medical records back with the jury, again, the nature of Susan's injuries had nothing to do with counsel's defense strategy. The fact that different counsel may have pursued a different strategy does not require a finding that trial counsel for Robbins was ineffective. See *Van Alstine v. State*, 263 Ga. 1 (426 SE2d 360) (1993). Finally, the trial court was correct in stating to the jury that it was their job, and not that of the trial court, to remember the evidence and form their own conclusions based on it. We find no merit to Robbins' contention that his trial counsel was ineffective for agreeing to the manner in which the trial court handled the questions from the jury.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 31, 2016 —
RECONSIDERATION DENIED DECEMBER 8, 2016.

*Amy L. Ihrig,* for appellant.

*Meg E. Heap, District Attorney, Lyndsey H. Rudder, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Aimee F. Sobhani, Assistant Attorney General,* for appellee.