307 Ga. 520
FINAL COPY

S19A1334.  SPENCE v. THE STATE.

BOGGS, Justice.

Mary Ann Spence was convicted of malice murder in connection with the death of Samuel Miller ("Samuel"), a 16-month-old baby left in her care. She appeals, arguing that the evidence was insufficient to support her murder conviction. She also argues that the trial court erred both in permitting the State to improperly bolster the testimony of an eyewitness and in not sua sponte charging the jury on the defense of accident. We affirm.[1]

---

[1] The victim was killed on April 3, 2011. On July 22, 2011, a Fulton County grand jury indicted Spence for malice murder, three counts of felony murder, aggravated assault, cruelty to children in the first degree, and cruelty to children in the second degree. After a trial from January 8 to 16, 2013, the jury found Spence guilty of all charges. The trial court sentenced Spence to serve life in prison for malice murder. Although the trial court purported to merge the three guilty verdicts for felony murder into the malice murder conviction, the felony murder verdicts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371 (4) (434 SE2d 479) (1993). Moreover, even though the trial court merged all of the remaining verdicts with the malice murder conviction, we need not address the propriety of those rulings because the State has not challenged them on appeal. See *Dixon v. State*, 302 Ga. 691, 697-698 (4) (808 SE2d 696) (2017). On February 8, 2013,

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following: In April 2011, Spence was staying in an apartment in the Carver Homes community in Atlanta with her daughter, Classie Fields, and Fields' three children — her five-year-old son J.P., her one-year-old son, and her nine-year-old daughter. Jennifer Miller ("Miller") — Fields' best friend — was staying with Fields at the time, along with her two children — Samuel and his three-year-old sister.

At around 5:30 a.m. on April 3, 2011, Fields left her apartment and went to work. Hours later, while Miller prepared to go to church, Spence offered to stay at the apartment and watch all the boys, because she recognized that they would be difficult to handle at church. Miller accepted Spence's offer and went to church along with her daughter and Fields' daughter.

Sometime between when Miller left for church and 12:45 p.m.,

---

Spence filed a motion for new trial, which she amended on July 30, 2015. After an evidentiary hearing, the trial court denied the motion on March 21, 2018. Spence filed a timely notice of appeal, and the case was docketed in this Court for the August 2019 term and submitted for decision on the briefs.

J. P., who was in the apartment's living room with his brother, peered into one of the apartment's bedrooms and saw Spence — his grandmother — and a sobbing Samuel. According to J. P., Spence picked Samuel up, shook him several times, and threw him down onto a "hard" bed[2] where he hit his head, causing his eyes to go "to sleep." Spence was the only adult in the apartment at that time.

At around 12:45 p.m., Spence abruptly entered the apartment of Sharon Blackwell — her across-the-hall neighbor — and stated that Samuel was unconscious. Spence stated that he had fallen and hit his head earlier that day, and that she had already called 911. Blackwell and Spence then returned to the apartment, where Samuel was lying motionless on a futon in the living room and was cold to the touch. Blackwell's friend then came into the apartment and attempted CPR, and after a while, another neighbor took over resuscitative care. Spence then called 911. Paramedics transported Samuel to an Atlanta children's hospital, but, despite the efforts of medical personnel, his heartbeat was never restored, and a doctor

---

[2] J. P. testified that the bed "needed a new mattress."

declared him dead shortly after he arrived.

According to a responding police officer, upon her arrival, she encountered Spence outside of Fields' apartment. Spence then gave the officer the following account: She was in a room in the back of the apartment cleaning while Samuel, J. P., and J. P.'s little brother were playing in the living room in the front of the apartment; she heard Samuel crying, at which point she returned to the living room; she concluded that Samuel had fallen and bumped his head on a table; she picked him up, gave him a bottle of juice, and put him down in one of the bedrooms for a nap; when she came back about an hour later, she noticed that something was wrong with Samuel, as he was unresponsive and was foaming at the mouth; she then went next door to Blackwell's apartment to get help. The officer stated that she then asked J. P. — who was standing directly in front of Spence — what had happened, and he started to answer but then stopped mid-sentence and said "I don't know."

Spence also agreed to accompany an Atlanta Police detective back to his office, where she gave a statement largely consistent with

4

the account she gave to the responding police officer. However, this time, she added that when she came into the living room to see why Samuel was crying, he was holding his head, and J. P. stated that Samuel had fallen. Spence also stated that, when she picked Samuel up, gave him some juice, and put him down for a nap, his "breathing was excellent." Spence was not immediately arrested. In fact, the police did not consider her a suspect in Samuel's death until a medical examiner ("ME") performed an autopsy and ruled Samuel's death a homicide.

The ME found multiple bruises on Samuel's chest, shoulder, and chin, and noted that his face and head were quite swollen. He determined that blunt force trauma to the head killed Samuel, and that the "tremendous" blows to his head punched a hole in his skull three-quarters-of-an-inch in diameter and caused complex fractures across the surface of his skull. The ME opined that a five-year-old could not have caused Samuel's injuries, the multiple areas of bruising and bleeding on his scalp indicated that his injuries were inflicted by more than one blow, and he could not have sustained his

injuries in the course of normal play or roughhousing, unless he had fallen from the second story of a building or higher. He also opined that Samuel likely could not have functioned after sustaining the lethal blow. More specifically, he opined that Samuel could not have consumed any juice after experiencing such a devastating head injury.

A physician testified that he was on duty in the emergency department of the children's hospital when Samuel arrived. He stated that Samuel was not breathing and his heart was not beating. He examined Samuel's head and noted that it was swollen, asymmetrical, and "squishy." He opined that based on the amount of swelling, Samuel had suffered multiple head injuries. And although he declined to say that, categorically speaking, no person could sustain the same injuries that Samuel did and thereafter still be conscious and have the capacity to function, he ultimately deferred to the ME's opinion on that issue. He also noted that medical records showed that, in March 2011, Samuel came to the clinic at the children's hospital and was treated for a cold and viral

mouth blisters. But he testified that, other than that incident, the medical records did not indicate that Samuel had any irregular medical appointments prior to April 2011.

A second physician testified that she provided care to Miller and Samuel shortly after Samuel's birth. She stated that Samuel's post-birth examinations were "completely normal." Although she did note that the medical records indicated that Miller may have smoked cigarettes and marijuana while pregnant with Samuel, and that Miller did not receive adequate prenatal care, she testified that there was no evidence that Miller's prenatal smoking negatively affected Samuel's skull.

Fields, Miller, and Samuel's father all testified that Samuel was a healthy boy prior to his death. Fields and Miller both stated that, the night before his death, Samuel was behaving normally and did not have any bruises. Samuel's father testified that when he last saw Samuel on March 16, 2011, he did not have any bruises on his forehead or torso.

1. Spence argues that the evidence presented at trial was not

sufficient to support her murder conviction. She contends that the State's case, which was entirely dependent on circumstantial evidence, failed to exclude every reasonable hypothesis of her innocence, including the possibilities that Samuel's death was the result of a preexisting physical ailment, a hard fall, or a tumble which exacerbated a previously unknown physical condition. We disagree.

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, this Court views all of the evidence presented at trial in the light most favorable to the verdicts and asks whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). In addition, under Georgia statutory law, see OCGA § 24-14-6, in order to convict Spence based solely upon circumstantial evidence,

> the proven facts had to be consistent with the hypothesis of [her] guilt and exclude every reasonable hypothesis save that of [her] guilt. Not every hypothesis is

8

reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.

*Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019) (citation and punctuation omitted).

Spence's sufficiency arguments fail for two reasons. First, the record does not support her contention that the State secured her murder conviction solely upon circumstantial evidence. Quite to the contrary, J. P. testified that he saw Spence slam Samuel onto a "hard" bed, at which point Samuel's eyes went "to sleep." That was direct evidence of Spence's guilt.

Secondly, even if Spence's murder conviction did rest only on circumstantial evidence, the jury was presented with ample circumstantial evidence on which to conclude that she was guilty beyond a reasonable doubt of murder, and also that her hypotheses of innocence were unreasonable. As summarized above, that

evidence showed that Samuel generally was a healthy boy who — while present in an apartment with two young children and Spence — was suddenly killed by blunt force trauma so intense that it punched a hole in his skull and immediately incapacitated him. The evidence also showed that Samuel could not have sustained his injuries from a fall unless he had fallen from the second story of a building or higher, which Spence does not suggest occurred. Thus, the jury was authorized to find Spence guilty of murder, and we will not disturb the jury's rejection of Spence's hypotheses of innocence. *Cochran*, 305 Ga. at 829 (1). We therefore conclude that the evidence was sufficient to authorize the jury to find beyond a reasonable doubt that Spence was guilty of murder. *Jackson*, 443 U. S. at 319.

2. Spence argues, for the first time on appeal, that the trial court erred in permitting four witnesses to testify to prior statements uttered by J. P. in the days and weeks following Samuel's death, which concerned Spence's actions on the date in question, as that amounted to improper bolstering of J. P.'s testimony. She contends that the statements did not qualify as prior

consistent statements admissible under OCGA §§ 24-8-801 (d) (1) (A) and 24-6-613 (c). We conclude that the trial court did not plainly err in this respect.

Because Spence did not object on this basis below, we review these claims only for plain error, which requires Spence to make the following four showings: (1) there was an error that she did not affirmatively waive; (2) the error was obvious; (3) the error affected her substantial rights, which means she must demonstrate that it likely affected the outcome of her proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. OCGA § 24-1-103 (d). *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

Under our Evidence Code, a witness' prior out-of-court statement is admissible if

> the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement or a prior consistent statement under Code Section 24-6-613 *or is otherwise admissible under this chapter*.

OCGA § 24-8-801 (d) (1) (A) (emphasis supplied).

11

Spence cannot satisfy the third prong of plain error by showing that any erroneously admitted statement of J. P. likely affected the outcome of her trial. Even if not admissible as prior consistent statements, at least two of J. P.'s prior statements were admissible as excited utterances under OCGA § 24-8-803 (2), because they related to a startling event — Samuel's death — and were made shortly after that event while J. P. "was under the stress of excitement caused by [that] event."[3] At worst, then, the trial court erroneously admitted only two prior statements of J.P. It is highly unlikely that the two additional statements, even if presumed to have been improperly admitted, affected the outcome of Spence's

---

[3] OCGA § 24-8-803 (2) provides that out-of-court statements "shall not be excluded by the hearsay rule . . ." if they relate "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In this case, J. P. made two statements about Spence's actions on the day in question, both of which qualified as excited utterances. First, J. P. told Fields mere hours after witnessing Samuel die that he saw Spence shake Samuel and throw him onto a bed more than once. Second, a neighbor who rushed into the apartment to perform CPR on Samuel overheard J. P. say that Spence threw Samuel into a wall. See *Robbins v. State*, 300 Ga. 387, 389-390 (2) (793 SE2d 62) (2016) ("It is the totality of the circumstances, not simply the length of time that has passed between the event and the statement, that determines whether a hearsay statement was an excited utterance.") (citation and punctuation omitted).

12

trial in a manner that would satisfy the plain error standard, given the strength of the independent circumstantial evidence of Spence's guilt.[4] See *Character v. State*, 285 Ga. 112, 120 (6) (674 SE2d 280) (2009) (admission of witness' prior consistent statement harmless because State presented strong independent circumstantial evidence of defendant's guilt).

In short, because Spence has not shown that the trial court's allowing the State to elicit two of J. P.'s prior statements likely affected the outcome of her trial, she has not established plain error. See *Kelly*, 290 Ga. at 33 (2) (a).

3. Finally, Spence argues, also for the first time on appeal, that the trial court plainly erred by not charging the jury sua sponte as to her "sole defense" of accident. We disagree.

OCGA § 16-2-2 provides that no person shall "be found guilty

---

[4] As discussed above, the evidence at trial showed that Samuel, who was by all accounts a healthy boy on the date in question, died from "tremendous" blows to the head while he was under the care of Spence alone – an undisputed fact, the nature and severity of his injuries negated any reasonable inference that either of the two small children present in the apartment caused those injuries or that he sustained them by accident, and an expert witness explained that Spence's account of the events was inconsistent with the medical evidence.

13

of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." "[T]o authorize a jury instruction there need only be produced at trial slight evidence supporting the theory of the charge." *State v. Newman*, 305 Ga. 792, 796-797 (2) (a) (827 SE2d 678) (2019) (citation and punctuation omitted).

Here, even if Spence could show that the trial court obviously erred in not charging the jury as to the defense of accident, she has failed to carry her burden of demonstrating that any such error likely affected the outcome of her case. See *Kelly*, 290 Ga. at 33 (2) (a). As we have long noted, where, as here, the jury was fully charged on the State's burden to prove every element of the crime of murder — including intent — and the jury finds the defendant guilty of malice murder, the jury "could not have believed the victim's death to be the result of an act committed in the absence of criminal intent." *Sears v. State*, 290 Ga. 1, 4 (3) (717 SE2d 453) (2011) (citations and punctuation omitted). See also *Phillips v. State*, 247 Ga. 13, 13 (273 SE2d 606) (1981) (trial court's failure to give an

14

accident instruction not reversible error because jury's decision to find defendant guilty of malice murder necessarily meant it found that the defendant acted intentionally).

Under these circumstances, Spence has not shown that the trial court's failure to sua sponte charge the jury as to the defense of accident likely affected the outcome of her case.[5] Thus, she has failed to demonstrate that the trial court plainly erred in this respect, and we affirm her murder conviction.

*Judgment affirmed. All the Justices concur.*

DECIDED DECEMBER 23, 2019.
Murder. Fulton Superior Court. Before Judge Campbell.
*Edward V. C. Silverbach*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder,*

---

[5] We also note that Spence did not explicitly assert an accident defense at trial. In fact, during the State's closing argument, she expressly rejected the State's suggestion that she was raising such a defense by stating "*I don't think there was any argument about that it was an accident[,] and no evidence that it was an accident.* So I'm not understanding the State's argument." (Emphasis supplied.)

*David K. Getachew-Smith, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.