301 Ga. 90
FINAL COPY

S17A0283.  REDDICK v. THE STATE.

BOGGS, Justice.

Appellant Damien Kinard Reddick was convicted of murder in connection with the shooting death of Cory Johnson.[1] The trial court denied his amended motion for new trial, and he now appeals, asserting as his sole enumeration of error that the trial court erred in refusing his written request to charge on a lesser included offense of involuntary manslaughter. For the reasons that follow, we affirm.

1. "To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." (Citations and punctuation omitted.) Hicks v. State, 287 Ga. 260, 262 (2) (695 SE2d 195) (2010).

---

[1] The crime occurred on December 28, 2011. On March 1, 2012, a Gwinnett County grand jury indicted Reddick for felony murder and aggravated assault. He was tried before a jury September 16-22, 2014. The jury found Reddick guilty on both counts, and the trial court merged the aggravated assault charge with the felony murder charge.  See Malcolm v. State, 263 Ga. 369, 372-373 (5) (434 SE2d 479) (1993). His amended motion for new trial was denied on June 8, 2016, his notice of appeal was filed on June 15, 2016, and the case was docketed in this Court for the term beginning in December 2016. The case was submitted for decision on the briefs.

The evidence presented at trial showed that two female graduates of Shiloh High School, Charne Baker and Lauren Jordan, had a quarrel via telephone and social media that escalated into threats. Apparently encouraged by Jordan's friend, Danielle O'Grady, the girls agreed to meet to settle the argument at a house near the high school. By the time they arrived, a crowd had gathered to witness the fight. The girls brought various supporters to the location: Jordan and O'Grady invited appellant and his friend Nigel Lynch, who both attended a different school. The victim was a friend of a resident of the house, Shukriyyah Bascoe, who was aligned with Baker.

In the back yard of the house, O'Grady encouraged Jordan to fight Baker, but Jordan's boyfriend pulled her away, and O'Grady began to fight with Baker. While Bascoe was trying to separate them, an unidentified male intervened and punched Baker in the face. The victim remonstrated that he should not hit a girl, and a fight ensued as the victim and others began hitting the unidentified male who had punched Baker. During this secondary melee, shots were fired; witnesses testified to hearing as few as two or as many as six gunshots. A witness testified that she saw the shots fired, and that the shooter was holding the gun horizontally as he fired, "pointed straight ahead" even

though his arm was "flailing about." She added that the shooter then fired four more shots straight up in the air as he left. Shortly afterward, the police arrived and found the victim dead in the back yard with two gunshot wounds to the chest and abdomen. The medical examiner testified that the victim's body showed two through-and-through gunshot wounds. One entered the victim's chest on the left side on a downward angle, penetrating his heart and one lung, and exiting the body on the right side of the back. The second shot entered the victim's right shoulder, grazed his liver, and exited under his right armpit area, making a square exit wound that indicated the bullet was "tumbling" as it passed through the victim's body.

After the shooting began, O'Grady and her companions fled the scene but could not locate Lynch. Appellant and his female friend, Ashley Moe, waited at Lynch's car for some time and then walked back toward the house. They found Lynch, who was bleeding severely from the head, and took him to the hospital; Lynch told them that "somebody hit him with a gun." O'Grady testified that appellant told her that "Nigel had gotten jumped" and beaten. The witness who saw the shots fired testified that the shooter was one of two men with O'Grady's group who came together and attempted to flee together after

3

the shooting. The same witness testified that the shooter was the one who "ran away and left," although she did not get a good look at his face, while his companion became involved in a fight and was left behind.

O'Grady pleaded guilty to involuntary manslaughter and testified at trial; she stated that she had invited appellant to accompany them and asked him to bring his gun to "scare" anyone from the other group who tried to "jump" them. She also testified that when she spoke to appellant on the phone after the incident, he told her that several individuals "were trying to jump . . . me" and when one of them was "coming toward me, I just closed my eyes and I shot." O'Grady asked, "So you shot him?" and appellant replied, "Yeah, I shot his a__ twice." In her testimony at her sentencing, which she read for the jury, O'Grady said that appellant drew his gun in an attempt to get the individuals to back off, but "this one . . . was still acting like he wanted to fight, so I blasted his a__ twice." She confirmed similar statements to police. A police officer testified that in her second police interview, O'Grady told him that appellant said he fired once in the air and then pointed the gun at several people, and when they did not react "he shot two more times."

Moe told police that appellant displayed a firearm on the way to the scene

and that appellant later told her he fired two rounds in the air. But she disavowed that statement at trial, saying that the only gun she saw was a long gun being held by "some dude standing outside the patio." Appellant did not testify at trial, but in his videotaped police interview, which was played for the jury, he admitted that he brought "a green knife" to the scene, but repeatedly denied having a gun. While confined to jail, appellant had a telephone conversation with Moe which was monitored by the police; in that conversation he denied he had a gun that night, instructed Moe to say he did not have a gun, and told her to be sure that O'Grady said he did not have a gun.

Appellant argues that evidence was presented that he engaged in reckless gunplay by firing in the air, and that such an act would support a misdemeanor charge of reckless conduct, which in turn would support a charge of involuntary manslaughter under OCGA § 16-5-3 (a).[2] Appellant cites <u>Simmons v. State</u>, 266 Ga. 223 (466 SE2d 205) (1996), and <u>Banks v. State</u>, 329 Ga. App. 174 (764 SE2d 187) (2014), to the effect that "there was no evidence of [appellant's] reckless conduct other than that directly related to the death of the

---

[2] "A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony."

victim." 266 Ga. at 229 (7) (b), cited in 329 Ga. App. at 176 (2). The State responds that, regardless of whether appellant fired in the air at some point, the witness who saw the fatal shots fired testified that they were fired horizontally, and thus any shots fired in the air did not cause the victim's death.

Even if the evidence presented authorized the requested charge, "[t]he failure to give a requested charge which is authorized by the evidence can be harmless error. The inquiry is whether it is highly probable that the error contributed to the verdict." (Citations and punctuation omitted.) Brown v. State, 289 Ga. 259, 261 (2) (710 SE2d 751) (2011). Pretermitting whether the trial court should have given the requested charge, we find that any error in refusing to do so was harmless. The evidence showed that appellant was asked by O'Grady to bring his gun to the fight to protect them from the rival group, and he did so, displaying it to his girlfriend. His friend and schoolmate, Lynch, was attacked by several individuals, including the victim, shortly before the shots were fired, and left behind as the other members of the O'Grady party fled. The only witness who saw the fatal shots fired testified that the shooter held the gun horizontally, and also fired several shots into the air as he was fleeing the scene, leaving his companion behind. Appellant told O'Grady that he "blasted" the victim twice, and the victim had two through-and-through

6

bullet wounds. Appellant, though he did not testify, denied to police that he had a gun at all that night, and while in jail he told Moe and O'Grady to say the same. In addition, the trial court instructed the jury on the presumption of innocence, circumstantial evidence, and the State's burden to prove identity and all elements of felony murder and aggravated assault beyond a reasonable doubt. "Accordingly, we conclude it is highly probable that the trial court's refusal to charge on involuntary manslaughter did not contribute to the verdict, and we affirm appellant's conviction. [Cits.]" Bonman v. State, 298 Ga. 839, 841 (2) (785 SE2d 288) (2016) (refusal to give involuntary manslaughter charge, even if error, was harmless; appellant's contention that he shot into air inconsistent with other evidence and witness testimony); compare Manzano v. State, 282 Ga. 557, 558-559 (2) (651 SE2d 661) (2007) (involuntary manslaughter charge required based on evidence that appellant and victim were engaged in horseplay with pistol both believed to be unloaded).

2. While Reddick does not challenge the sufficiency of the evidence in his appeal, we note that it was sufficient to support his conviction under Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Judgment affirmed.  All the Justices concur.

Decided May 1, 2017.

7

Murder. Gwinnett Superior Court. Before Judge Head, pro hac vice.

G. Richard Stepp, for appellant.

Daniel J. Porter, District Attorney, Christopher M. Quinn, John A. Warr, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Aimee F. Sobhani, Assistant Attorney General, for appellee.