308 Ga. 772
FINAL COPY

S20A0309.  SULLIVAN v. THE STATE.

BETHEL, Justice.

A Richmond County jury found Monique Sullivan guilty of felony murder predicated on aggravated assault in connection with the death of Amelia Hiltz; the aggravated assaults of Maureen Floyd and Kevin Mollenhauer; reckless conduct in regard to Grayson Tucker and Olden Ganus; cruelty to children in the second degree in regard to Sullivan's son, J. S.; and three traffic offenses.[1] Sullivan

---

[1] The crimes occurred on December 10, 2012. On September 3, 2013, a Richmond County grand jury returned an 11-count indictment charging Sullivan with: (1) felony murder of Amelia Hiltz based on aggravated assault; (2) aggravated assault of Maureen Floyd; (3) aggravated assault of Kevin Mollenhauer; (4) aggravated assault of Grayson Tucker; (5) aggravated assault of Olden Ganus; (6) homicide by vehicle in the first degree with regard to Hiltz; (7) serious injury by vehicle with regard to Floyd; (8) cruelty to children in the second degree with regard to J. S.; (9) driving on the wrong side of the roadway; (10) speeding; and (11) failure to obey a traffic control device.

At a trial held from June 15 to 19, 2015, the jury found Sullivan guilty of felony murder (Count 1), two counts of aggravated assault (Counts 2 and 3), two counts of misdemeanor reckless conduct as lesser offenses of aggravated assault (Counts 4 and 5), cruelty to children (Count 8), and the three misdemeanor traffic offenses (Counts 9, 10, and 11). The jury found Sullivan not guilty of homicide by vehicle and serious injury by vehicle (Counts 6 and 7). Sullivan was sentenced on July 23, 2015, to a term of life imprisonment for

now appeals, arguing that the evidence introduced at trial was insufficient to support the jury's guilty verdicts with regard to the felony murder of Hiltz and the aggravated assaults of Floyd and Mollenhauer. Sullivan also argues that the trial court erred by not instructing the jury on accident, preventing Sullivan from presenting evidence that she did not suffer from any mental illness, and permitting the State to introduce inadmissible hearsay. Finding no reversible error, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Around 10:30 a.m. on December 10, 2012, Sullivan was driving her Chevrolet Suburban on Greene Street away from downtown Augusta. Her husband was

---

felony murder (Count 1) and concurrent prison terms of 20 years for each aggravated assault (Counts 2 and 3), 10 years for cruelty to children (Count 8), and 12 months each for two counts of reckless conduct (Counts 4 and 5), driving on the wrong side of the roadway (Count 9), speeding (Count 10), and failure to obey a traffic control device (Count 11).

Through trial counsel, Sullivan filed a motion for new trial on August 14, 2015. Sullivan amended that motion through new counsel on May 6, 2019. Following a hearing held on June 17, 2019, the trial court denied the motion for new trial, as amended, on June 28, 2019. Sullivan filed a notice of appeal on July 8, 2019. This case was docketed to this Court for its term beginning in December 2019 and submitted for a decision on the briefs.

in the front passenger seat of the Suburban, and their four-year-old son, J. S., was in a car seat in the back seat. Sullivan ran a red light at the intersection of Greene Street, Broad Street, and the entry and exit ramps for Riverwatch Parkway. After running the red light, Sullivan's Suburban veered slightly to the left into the opposite lane of traffic — missing a westbound car in the intersection by inches — before proceeding onto the Riverwatch Parkway exit ramp going the wrong way (west in the eastbound lanes).[2]

Riverwatch Parkway has two lanes running westbound and two lanes running eastbound, with either a median and guardrails or concrete barriers dividing the highway. The speed limit on Riverwatch Parkway is 55 miles per hour. There is a "Do Not Enter" sign posted at the bottom of the off-ramp that Sullivan drove up to get onto Riverwatch Parkway, a raised median and painted yellow stripes dividing the exit ramp lanes from the entrance ramp lanes, and a "Wrong Way" sign further up from the "Do Not Enter" sign.

---

[2] The witness who observed Sullivan run the red light and proceed onto the off-ramp testified that he "didn't think they knew they were going the wrong way."

Sullivan's Suburban sped up and continued traveling the wrong way in the left eastbound lane of Riverwatch Parkway. The path taken by the Suburban forced four drivers, including Grayson Tucker and Olden Ganus, to swerve from the left lane into the right lane in order to avoid a head-on collision. Those drivers testified that the Suburban did not slow down, swerve, switch lanes, or engage in any other evasive maneuvers to warn or avoid colliding with other vehicles. Ganus testified that Sullivan's Suburban appeared to be moving about 80 miles per hour when it passed him and was "just barreling down the road."

After passing those four vehicles, Sullivan's Suburban entered a sharp curve near Eisenhower Park. At the time, three other vehicles were entering the curve heading eastbound. The Suburban collided head-on with a van being driven by Amelia Hiltz and was then propelled about five to six feet into the air above the guardrail to the right. The Suburban landed on the guardrail and started bouncing, before flipping back over into the eastbound lanes of Riverwatch Parkway. Hiltz's vehicle suffered significant damage

and was pushed into the right shoulder of the eastbound side of the road. As the Suburban lay flipped over, vehicles driven by Kevin Mollenhauer and Maureen Floyd collided with it. The distance from the off-ramp to the crash site was between 2.7 and 2.8 miles.

Mollenhauer testified at trial that he had been traveling eastbound on Riverwatch Parkway when he heard a crash and saw the Suburban rotating in the air and begin flipping toward him. He testified that, when he saw the Suburban, he "thought [he] was probably going to die." Mollenhauer turned his car to the right and applied his brakes, and his vehicle collided with the rear of Sullivan's Suburban while it was overturned. His car then careened into Hiltz's vehicle where it had come to rest on the right shoulder. The impact with the Suburban broke a window in Mollenhauer's car, and he had "a lot of glass that was all down [his] neck and [his] arms." He was able to drive a car following the crash, but he testified that he had not owned or driven a car between that time and the time of trial (almost two-and-one-half years later).

Floyd testified that she had been driving in the right eastbound

lane on Riverwatch Parkway when the car in front of her slowed "drastically." She then heard the sound of twisting metal, which appeared to be coming from above her. She "instinctively" moved into the left lane, and she testified that it "felt like a car fell out of the sky" onto her. Her car collided with Sullivan's Suburban and was spun back and to the right before coming to rest on the right shoulder. Floyd suffered a number of injuries, including a ruptured aorta and collapsed lungs, which required emergency treatment. She was later treated in intensive care and was placed in a chemically induced coma for almost three weeks. Floyd testified that she did not return to work until May 2013, and that she has had to slow down her business "tremendously." She also testified that she was in fear of being injured when Sullivan's Suburban hit her, and that it was the loudest sound she had ever heard.

Just after the collisions, another witness who was driving eastbound on Riverwatch Parkway arrived on the scene, stopped his vehicle, and got out. As he walked toward Sullivan's Suburban, he saw that J. S. was trying to crawl out of the window and was about

to slide under the guardrail and into the westbound lanes of Riverwatch Parkway. After J. S. got out of the Suburban, the witness told J. S. to come toward him, and the two walked across Riverwatch Parkway. J. S. appeared to be dazed and did not say much. At the time, Sullivan and her husband were still strapped into their seats and were talking to each other.

Tiffany Jensen, a nurse, was driving eastbound on Riverwatch Parkway just as the collision occurred, and she pulled onto the side of the road. When she got out of her car and looked at the Suburban, she saw J. S. screaming and attempting to get out of the vehicle. After J. S. walked across Riverwatch Parkway, Jensen took a blanket from her car and laid him on it. J. S. was bleeding, and Jensen was concerned that he had a head injury. Jensen rode with J. S. to the hospital in an ambulance, and stayed with him while he had a CT scan. A pediatric emergency medicine physician diagnosed J. S. with a hematoma, multiple superficial lacerations on the left wrist, and a laceration on the scalp. His wounds later required surgery.

Karen LeBlanc, a pediatric emergency room nurse at the hospital, took over caring for J. S. around 1:20 p.m. after Jensen left the hospital. When LeBlanc came on duty, J. S. was asleep in a trauma bay but woke up a few minutes later when a plastic surgeon came in to examine his wrist. The surgeon asked LeBlanc to start preparing a surgical checklist, which included information on J. S.'s vital signs, medical history, and allergies. While she was doing so, J. S. told LeBlanc that his father was trying to make Sullivan stop the car, but Sullivan would not because they were "fussing."

When paramedics responded to the scene of the crash, Hiltz had a decreased level of consciousness, and after she was extracted from her van, she was transported to a local hospital. When Hiltz arrived, she was unresponsive. She had multiple fractures of the bones of her face, multiple lacerations to her face and head, multiple bleeds within her head, two collapsed lungs, and multiple rib fractures on both sides. She was placed on a ventilator and transferred to the hospital's intensive care unit. On July 23, 2013, Hiltz died from complications arising from the injuries she sustained

in the crash.

Sullivan was transported to a local hospital and treated for the injuries she sustained in the collision. Sergeant Tim Owen interviewed Sullivan at the hospital nine days later. Sullivan was able to tell him what happened up until she got near Riverwatch Parkway, but after that she could not provide him with any information about how or why she was driving on Riverwatch Parkway. In his investigation of the crash, Owen found no evidence that Sullivan applied her brakes and concluded that the combination of the limited line of sight in the curve and the speed of both drivers (Sullivan and Hiltz) made it likely that neither had an opportunity to react and apply the brakes before they collided.

Corporal Charles Benson of the Richmond County Sheriff's Office Traffic Division was qualified as an expert in traffic crash investigation and reconstruction. Corporal Benson testified that a driver on Greene Street who crossed Broad Street would normally go straight onto the entry ramp of Riverwatch Parkway and that a person would have to make a conscious decision to steer left to end

up on the wrong ramp.[3] Corporal Benson also testified that there were at least five places along the route driven by Sullivan from the off-ramp to the crash site where she could have safely pulled off the road. Corporal Benson testified that a vehicle traveling in the left eastbound lane of Riverwatch Parkway would not have sufficient room on the left side of the road to avoid a collision with a vehicle it met head-on in that lane. Nothing in Corporal Benson's investigation suggested that the emergency flashers or brake lights on Sullivan's Suburban were activated at the time of the crash, nor did anything in the investigation indicate that Sullivan made any effort to avoid the collisions.

Scott Smith, a Team Commander for the Georgia State Patrol's Specialized Collision Reconstruction Team, downloaded data from the airbag control module in Sullivan's Suburban which showed that

---

[3] On cross-examination, Corporal Benson testified that, because the intersection of Riverwatch Parkway, Greene Street, and Broad Street is configured such that the on- and off-ramps intersect a crossroad, an inadvertent wrong-way driving accident could occur. Corporal Benson also testified that a publication by the National Transportation Safety Board indicated that this type of intersection configuration created the highest risk of wrong-way driving.

in the five seconds preceding the crash, the Suburban was traveling between 75 and 78 miles per hour. Smith saw no indication that the Suburban's brakes were applied, and he testified that the data indicated that the cruise control on the Suburban was set at 77 miles per hour at the time of the crash. He testified that it was "uncommon" for the cruise control to be set at the time of a crash.

Sullivan argues that the evidence presented at trial and summarized above was not sufficient to support the jury's guilty verdicts with regard to the felony murder of Hiltz and the aggravated assaults of Floyd and Mollenhauer. In addition, although not raised as error, as is this Court's practice, we review the sufficiency of the evidence for the other crimes for which Sullivan was found guilty and sentenced: two counts of reckless conduct, cruelty to children in the third degree, driving on the wrong side of the roadway, speeding, and failure to obey a traffic control device.

(a) As to the felony murder of Hiltz (predicated on aggravated assault) and the aggravated assaults of Floyd and Mollenhauer,

Sullivan argues that the State did not prove the element of intent. Sullivan argues that although the State did not have to prove that Sullivan had the specific intent to injure Hiltz, Floyd, and Mollenhauer, the State was required to prove beyond a reasonable doubt that Sullivan intended to drive her Suburban in the direction of the victims, citing the Court of Appeals' decision in *Patterson v. State*, 332 Ga. App. 221 (770 SE2d 62) (2015). Sullivan further argues that although the State produced some circumstantial evidence in support of the theory that she intentionally drove the wrong way on Riverwatch Parkway, the evidence did not exclude the reasonable hypothesis that she did so accidentally.

When evaluating the sufficiency of evidence as a matter of federal due process under the Fourteenth Amendment of the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's

assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). The jury's resolution of these issues "adversely to the defendant does not render the evidence insufficient." (Citation omitted.) *Graham v. State*, 301 Ga. 675, 677 (1) (804 SE2d 113) (2017). Further, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law. See *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019).

Here, although there was some evidence from which the jury could infer that Sullivan initially drove onto Riverwatch Parkway accidentally, the evidence presented at trial also showed that, in order to drive onto Riverwatch Parkway going the wrong direction,

Sullivan would have had to actively steer her vehicle to the left as she passed through the intersection of Greene Street, Broad Street, and Riverwatch Parkway. There were also warning signs on the off-ramp indicating that anyone driving in that direction was going the wrong way. Once Sullivan was on Riverwatch Parkway, she drove at approximately 80 miles per hour, and four vehicles had to swerve out of the way to avoid colliding with her. There were at least five places on the three-mile stretch of Riverwatch Parkway where Sullivan could have safely pulled over before entering the curve where the collisions occurred. Despite these opportunities to stop her vehicle, the evidence showed that she was driving in excess of 75 miles per hour with her vehicle's cruise control engaged when she collided with Hiltz.

Viewed in the light most favorable to the verdicts, the evidence presented by the State supports the jury's verdicts as to the counts for the felony murder of Hiltz (predicated on aggravated assault) and the aggravated assaults of Floyd and Mollenhauer. The evidence summarized above authorized the jury to determine that

the proved facts were not only consistent with Sullivan's guilt but that they also excluded every other reasonable hypothesis as to whether she intended to commit the crimes — including that the collisions were the result of an accident. Thus, when viewed as a whole, the evidence presented at trial was sufficient to support Sullivan's convictions for felony murder and two counts of aggravated assault as a matter of due process and under OCGA § 24-14-6. See *Frazier v. State*, 308 Ga. __, __ (2) (b) (841 SE2d 692) (2020). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

(b) We have reviewed the evidence presented at trial as to the remaining counts for which Sullivan was found guilty and sentenced. We conclude that such evidence was sufficient as a matter of due process to support the jury's verdicts as to those counts. *Jackson*, 443 U. S. at 319 (III) (B).

2. Sullivan also argues that the trial court erred by not

instructing the jury on the defense of accident. While we agree with Sullivan that the trial court erred, we determine that such error was harmless.

OCGA § 16-2-2 provides that no person shall "be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." "[T]o authorize a jury instruction[,] there need only be produced at trial slight evidence supporting the theory of the charge." (Citation and punctuation omitted.) *State v. Newman*, 305 Ga. 792, 796-797 (2) (a) (827 SE2d 678) (2019). "Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." (Citation and punctuation omitted.) *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019).

Sullivan submitted a written request to charge the jury on accident, and contrary to the trial court's ruling, there was at least

slight evidence supporting the giving of that charge.[4] The witness who saw Sullivan's Suburban drive through the intersection onto the Riverwatch Parkway off-ramp testified that he "didn't think they knew they were going the wrong way." There was also evidence showing that the on- and off-ramps were close together and could be mistaken for each other.

However, "[e]ven if the evidence presented authorized the requested charge, the failure to give a requested charge which is authorized by the evidence can be harmless error." (Citation and punctuation omitted.) *Reddick v. State*, 301 Ga. 90, 92 (1) (799 SE2d 754) (2017). The test for determining whether a nonconstitutional instructional error was harmless is "whether it is highly probable that the error did not contribute to the verdict. And in determining whether such an error is harmless, we assess the evidence from the

___

[4] The trial court based its decision on this Court's decision in *Davis v. State,* 269 Ga. 276 (496 SE2d 699) (1998). Sullivan contends that the trial court relied upon *Davis* for the proposition that, because Sullivan did not present evidence in support of the accident theory, she was precluded from asserting accident as an affirmative defense. To the extent Sullivan's assertion is correct, the trial court erred. As we recently discussed in *McClure*, "the defendant must present evidence supporting the affirmative defense only if the State's evidence does not support the defense." 306 Ga. at 858 (1).

viewpoint of reasonable jurors, not in the light most favorable to the verdicts." (Citations and punctuation omitted.) *Henry v. State*, 307 Ga. 140, 146 (2) (c) (834 SE2d 861) (2019). Here, although slight evidence authorized the jury instruction on accident that Sullivan requested, we determine that it is highly probable that the failure to give the instruction did not contribute to the verdict.

First, the evidence that authorized the charge, at most, authorized the jury to determine that Sullivan may have driven onto the off-ramp accidentally. But even that evidence was contradicted by Corporal Benson's testimony that a driver would have to intentionally bear her vehicle to the left in order to drive up the off-ramp in the manner that Sullivan did in this case (as opposed to driving straight onto the on-ramp). Additionally, evidence that Sullivan initially drove up the off-ramp accidentally had no bearing on why Sullivan continued driving for approximately three miles at between 75 and 80 miles per hour, passing multiple warning signs, at least five places on Riverwatch Parkway where she could have safely pulled her car onto the side of the road, and four motorists

who had to swerve from their lanes to avoid a head-on collision with her Suburban. The evidence also showed that the cruise control in Sullivan's Suburban was engaged when she collided with Hiltz and that Sullivan did not apply her brakes. Testimony from the State's collision reconstruction expert indicated that it was "uncommon" for the cruise control to be set at the time of a crash. Thus, although there was slight evidence suggesting that Sullivan's initial actions were accidental, there was compelling evidence presented by the State that she acted intentionally.

Second, although the jury was not instructed on the defense of accident, it was instructed on the presumption of innocence and the State's burden of proof. The jury charge explicitly instructed the jury that the State was required to prove the element of intent beyond a reasonable doubt as to each intentional crime for which Sullivan was charged and that it should acquit Sullivan of those charges if the State did not carry that burden. Because the element of intent is incompatible with Sullivan's theory of accident, when the jury found Sullivan guilty of crimes requiring a showing of intent, "it

necessarily must have discredited" the theory that her actions were accidental. *McClain v. State*, 303 Ga. 6, 10 (2) (810 SE2d 77) (2018). See also *Spence v. State*, 307 Ga. 520, 526 (3) (837 SE2d 334) (2019) (holding that where the jury is fully charged on the State's burden to prove every element of the crime, including intent, any error in not instructing as to accident is harmless).

In light of the foregoing, we conclude that, even if the trial court had given a charge to the jury on accident, it is highly probable that the verdicts would have been the same. Thus, the trial court's error in failing to instruct the jury on accident was harmless.

3. Sullivan next argues that the trial court erred by excluding evidence regarding her lack of history of mental illness. Sullivan argues that her alleged intent to commit the charged crimes was the central issue in this case and that any evidence which tended to disprove her intent was relevant and should have been admitted in her trial. We disagree that the trial court abused its discretion by prohibiting testimony on that issue.

The State moved in limine to exclude the testimony of two

psychiatrists who examined Sullivan while she remained hospitalized six days after the incident. The State argued that the testimony of these witnesses was not relevant to any issue in the case because Sullivan was not offering a defense premised on her mental health or condition and because the psychiatrists planned to testify that Sullivan suffered from no mental illness. The State also argued that the testimony should be excluded because the examination took place almost a week after the incident and Sullivan had provided the psychiatrists with no evidence from which they could ascertain her mental state at the time of the incident.

Sullivan responded that the State's case was implicitly premised on the notion that Sullivan was homicidal or suicidal at the time of the incident. Sullivan's counsel indicated that the defense did not plan to ask the psychiatrists whether, at the time of the incident, Sullivan had the criminal intent to commit suicide or homicide but would instead limit questioning to a presentation of their findings that she had not been diagnosed with manic-depression or major depression and that she had no history of

mental health problems.

The trial court reserved ruling as to whether the psychiatrists would be permitted to testify, indicating that it could not make a final ruling until it saw how the State presented its case. The State then asked that Sullivan be barred from referencing the psychiatrists' testimony in her opening statement. The trial court offered Sullivan the opportunity to call the psychiatrists for voir dire before ruling on the State's request, but Sullivan declined. The trial court then granted the State's motion to bar Sullivan from referencing the psychiatrists' testimony in her opening statement.

After the close of the State's evidence, Sullivan renewed her objections to the State's motion in limine and again asked that the testimony of the psychiatrists be admitted. The trial court overruled the objection, noting that it agreed with the State's position that it would be impossible for the psychiatrists to learn anything from Sullivan about the "immediacy of the accident that would be beneficial in court." The trial court also rejected Sullivan's claim in her motion for new trial that the evidence was relevant and should

have been admitted. Sullivan now argues that this series of rulings was erroneous.

OCGA § 24-4-401 provides that "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-402 ("Rule 402") further provides that, as a general matter, "[a]ll relevant evidence shall be admissible."[5] "Evidence which is not relevant shall not be admissible." Id. "Questions of relevance are within the sound discretion of the trial court, and absent a clear abuse of discretion, a court's decision to exclude evidence on the grounds of a lack of relevance will not be disturbed on appeal." *Derrico v. State*, 306 Ga. 634, 636 (3) (831 SE2d 794) (2019).

Here, Sullivan concedes that she did not raise any type of mental health related defense for which evidence of psychological

---

[5] Under Rule 402, relevant evidence is admissible "except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending."

evaluations might have been relevant. See *Virger v. State*, 305 Ga. 281, 302 (9) (c) (824 SE2d 346) (2019) ("[E]vidence of a criminal defendant's mental disability at the time of the alleged offense may be admissible to support the defenses of insanity, delusional compulsion, or self-defense[.]" (citations omitted)). See also *Paul v. State*, 274 Ga. 601, 603 (2) (555 SE2d 716) (2001) (holding that "expert evidence was irrelevant to the state of mind necessary to determine guilt in light of the defendant's refusal to assert an insanity defense or that he was mentally ill at the time of the conduct in question."). Moreover, Sullivan also concedes that she has pointed us to no legal authority under our Evidence Code for the proposition that a defendant should be permitted to introduce expert testimony that she has no history of mental illness in order to show that she did not intend to commit a crime. Because we likewise find no authority suggesting that evidence of Sullivan's lack of mental illness had "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," OCGA § 24-4-401, we cannot say that the trial court

abused its discretion by excluding this evidence.

4. Finally, Sullivan argues that the trial court abused its discretion by admitting the following statement that J. S. made to Karen LeBlanc at the hospital: "Daddy was trying to make Mama stop, but she wouldn't because they were fussing." Sullivan argues that the trial court erred by ruling at trial that this statement was admissible under the excited utterance exception to the hearsay rule set forth in OCGA § 24-8-803 (2). We disagree.[6]

"A trial court's decision to admit evidence is reviewed for an abuse of discretion." *Jenkins v. State*, 303 Ga. 314, 316 (2) (812 SE2d 238) (2018). OCGA § 24-8-803 (2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" shall not be excluded by the hearsay rule.

> While the declarant must still be under the stress or excitement that the startling event caused, the excited

---

[6] Because we determine that the trial court did not abuse its discretion in admitting this testimony as an excited utterance, we do not consider Sullivan's contention that the trial court erred in its ruling on Sullivan's motion for new trial that this statement was also admissible under the residual hearsay exception set forth in OCGA § 24-8-807.

utterance need not be made contemporaneously to the startling event. It is the totality of the circumstances, not simply the length of time that has passed between the event and the statement, that determines whether a hearsay statement was an excited utterance.

(Citations and punctuation omitted.) *Robbins v. State*, 300 Ga. 387, 389-390 (2) (793 SE2d 62) (2016).

The record shows that the statement at issue was made by J. S. to LeBlanc two to three hours after J. S., who was four years old at the time, had been involved in a serious multi-vehicle crash in which his mother had driven on the wrong side of the road at a high rate of speed for several miles while apparently arguing with J. S.'s father, narrowly missing four other motorists before colliding with Hiltz, Floyd, and Mollenhauer. See *United States v. Belfast*, 611 F3d 783, 818 (VI) (A) (11th Cir. 2010) (no abuse of discretion in admitting statement made four to five hours after initial traumatic event as excited utterance). The impact of the crash caused Sullivan's Suburban, in which J. S. was strapped into a car seat in the back seat, to fly onto the guardrail and flip over. J.S. then freed himself from the vehicle and was seen by witnesses at the scene to be dazed,

bleeding, and screaming. After being treated by a nurse at the scene of the crash, J. S. was transported to a hospital and treated for injuries (which later required surgery) without his parents being with him at any point. He then fell asleep in the hospital's trauma bay and made the statement at issue to LeBlanc as she was examining a wound to his arm after he awoke.

Given J. S.'s age, the extent of his injuries, and the traumatic circumstances leading to his hospitalization, we cannot say that the trial court abused its discretion by determining that, under the totality of the circumstances, his statement to LeBlanc related to "a startling event or condition" and that he made the statement "under the stress of excitement caused by the event or condition." OCGA § 24-8-803 (2). See *Robbins*, 300 Ga. at 390-391 (2). This enumeration of error therefore fails.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 18, 2020.

Murder. Richmond Superior Court. Before Judge Roper, Senior Judge.

*Amanda J. Walker*, for appellant.

*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.