**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**February 8, 2021**

# In the Court of Appeals of Georgia

A20A1840. SEMO v. THE STATE.

BARNES, Presiding Judge.

Humphrey Semo drove his vehicle in the wrong direction on an interstate until he crashed head-on into a vehicle with three occupants. Two of the occupants died at the scene, and the third occupant sustained catastrophic injuries. Tried by a jury, Semo was found guilty as charged of two counts of first degree vehicular homicide,[1]

---

[1] OCGA § 40-6-393 (a) provides, "Any person who, without malice aforethought, causes the death of another person through the violation of subsection (a) of Code Section 40-6-163, Code Section 40-6-390 or 40-6-391, or subsection (a) of Code Section 40-6-395 commits the offense of homicide by vehicle in the first degree and, upon conviction thereof, shall be punished by imprisonment for not less than three years nor more than 15 years." Both such counts of the indictment alleged that Semo committed this crime "through a violation of OCGA § 40-6-39, Reckless Driving, in that he did drive his vehicle in reckless disregard for the safety of persons and property by driving southbound in the northbound lane of Interstate 185 where the speed limit is 70 miles per hour."

and one count each of serious injury by vehicle,[2] reckless driving,[3] and (because of a Scheduled I controlled substance discovered on his person on the night of the collision) felony drug possession.[4] After merger of the reckless driving count,[5] Semo was sentenced on the remaining four counts. Denied a new trial, Semo challenges in this appeal his convictions for first-degree vehicular homicide and serious injury by

[2] OCGA § 40-6-394 (b) provides, "Any person who, without malice aforethought, causes an accident that results in bodily harm while violating Code Section 40-6-390 or 40-6-391 commits the crime of serious injury by vehicle." The indictment alleged that Semo committed this crime in that he, "without malice, did cause bodily harm to [an occupant of the other vehicle] by rendering his legs, members of his body, useless, through a violation of OCGA § 40-6-390, Reckless Driving, in that he did drive said vehicle in reckless disregard for the safety of persons and property by driving southbound in the northbound lane of travel on Interstate 185 where the speed limit is 70 miles per hour."

[3] OCGA § 40-6-390 provides, "Any person who drives any vehicle in reckless disregard for the safety of persons or property commits the offense of reckless driving." The indictment alleged that Semo committed this crime in that he, "did unlawfully drive [a vehicle], in a reckless manner in reckless disregard of the safety of persons and property by driving southbound in the northbound land of travel on Interstate 185 where the speed limit is 70 miles per hour."

[4] OCGA § 16-13-30 (a) provides, "[I]t is unlawful for any person to purchase, possess, or have under his or her control any controlled substance." This count of the indictment alleged that Semo "did unlawfully possess and have under his control [a certain] Schedule I controlled substance."

[5] See generally *Harris v. State*, 272 Ga. App. 366, 373-374 (6) (612 SE2d 557) (2005) (determining that, as a lesser included offense, the reckless driving count merged into the vehicular homicide count).

vehicle,[6] arguing that he was deprived of effective assistance of trial counsel. We affirm.

At Semo's trial, the following evidence was adduced from the State's witnesses. On the night of May 21, 2015, the Troup County 911 Office began receiving a series of calls initially reporting that a vehicle was traveling southbound along a specified area of Interstate 185 North; soon thereafter, the calls reported that a crash had resulted. Recordings of those calls were played for the jury. Semo was the wrong-way driver. He had entered the expressway via an *off* ramp at Exit 46, then proceeded for several miles at 65 to 70 miles per hour until slamming his white Toyota Sequoia into a red Toyota Rav4. As was stipulated at the trial, the speed limit of Interstate 185 was 70 miles per hour.

The trial witnesses called to the stand by the State included several of those 911-callers, other individuals who had seen the crash, and various law enforcement and investigative personnel who were involved in the aftermath. In addition, the State called to the stand the sole occupant of the red Rav4 who survived his crash injuries.

_____

[6] Semo makes no argument contesting his drug conviction. Notably, during closing argument, Semo's lawyer said to the jury, "I want to start with [the drug count] of the indictment which accuses Mr. Semo of being in possession of a controlled substance. That's something we can't deny. . . . So we are conceding that, ladies and gentlemen."

3

One such 911-caller testified that she and her friend were traveling together on Interstate 185 North when they "nearly got hit" by a white SUV that was heading toward them. As she elaborated at trial, the oncoming vehicle was "in the right lane area swerving. So in order for us to avoid him, because he was coming at us, we – my friend made [a] turn on the left lane." She testified that "it was really scary trying to go through that ordeal" and that she had been concerned that someone would get hurt, so she immediately called 911.

Another 911-caller testified that as he was driving on Interstate 185 North, he was using the right-most lane – "the slow one, not the hammer lane." At about mile marker 43, he recalled at trial, "[h]eadlights came at me and I swerved to get out of the way." The oncoming vehicle was heading southbound in his northbound lane. That area of Interstate 185, as the witness described at trial, was "two lanes north, two lanes south, a grassy median in the middle. So generally you shouldn't see any headlights coming your way." He immediately called 911.

A third caller recounted at trial that as he was driving from Columbus to Atlanta on Interstate 185, he discerned a vehicle approaching him in his same lane of travel. He moved into the right lane to avoid colliding with that vehicle; as soon as the oncoming vehicle passed him, he contacted 911 and reported the southbound

4

motorist traveling on Interstate 185 North. That witness further recounted at trial being very familiar with that area of Interstate 185; and when he encountered the oncoming motorist between mile markers 43 and 42, as he testified, "I had no idea where he would have gotten on because I knew the next exit wasn't until a few more miles."

Another caller was driving a loaded tractor-trailer at the time. As he testified, "I weighed about 80,000 pounds. And I looked up ahead and seen headlights" advancing toward him. As he recounted, he began flashing his truck's headlights at the approaching vehicle, pressing the truck's city horn on the steering wheel, and blaring the 18-wheeler's air horn above the driver's door "because I didn't know what was going to happen at that point." The truck driver testified, "I just took a chance to get in the right lane, you know, because that gives me more of an out being that big and that heavy where I can either take off towards the woods, get on the shoulder, or whatever." As he recalled at trial, by "easing over to the right a little bit," he avoided what he was able to discern thereafter was a white SUV. He further testified that, moments later, he heard a loud crash behind him, then observed from a mirror "headlights going off into the tree line into the woods. So apparently somebody tried to avoid it and went off into the tree line."

5

Another motorist – who had been traveling *southbound* on Interstate 185 *South* – testified that he had noticed the white SUV using an "off ramp to get on I-185 going southbound in the northbound lane." As he recollected at trial,

> I don't know what made me look over, but I looked over to the left and I saw the white car coming off of the exit ramp. And for some reason they were going the same speed I was, and I was trying to get their attention for a couple of miles, I guess. And I saw other vehicles swerve out of the way, and the 18-wheeler is what really struck me because I heard him blow his horn. And after that, that's whenever they collided with the red SUV. . . . [W]henever the collision hit[,] I was right there. I saw it across the road happen.

As that trial witness further detailed, the white vehicle had entered the interstate at Exit 46, then traveled for about four miles at approximately 65 to 70 miles per hour. All the while, the witness told from the stand, "I was honking the horn."

Other individuals had also seen the crash. One eyewitness was driving a work truck directly behind the red SUV. He testified that as he was traveling northbound on the interstate, he saw heading in his direction what he "thought . . . was backup lights at first, but then . . . realized it was headlights." He recounted, "So I swerved, and the red [SUV] didn't swerve. They got hit head on." The individual described at trial that, upon impact, "[the red SUV] went up in the air"; that he veered his work

6

vehicle "off to the right" of the road; and that the motorist behind him took a similar evasive action and drove further "off the road." The driver of the work truck and one of his passengers rushed back to the two SUVs that had collided to render aid.

The individual who had been a passenger in the work truck estimated at trial that they were traveling about 6- to 8-car-lengths behind the red SUV when it was struck. Upon the impact, the passenger testified, the "red car came over the front of our [work] truck, and we swerved out of the way and into the ditch." The passenger testified further that when their work truck finally came to a stop, he sprinted back to the wreckage to render aid.

The trial evidence showed that shortly thereafter, emergency responders began arriving, and they took over the scene. Ultimately, two occupants of the red SUV were pronounced dead at the scene by the Troup County Coroner who had meanwhile been summoned. The third occupant of the red SUV had survived his crash injuries, and he was airlifted to a hospital. Semo, who had been traveling alone in his vehicle, was transported by helicopter to a hospital in Atlanta.

A law enforcement officer assigned to a DUI task force serving the Atlanta metro-counties was dispatched to locate Semo at the Atlanta hospital upon his arrival. That officer found Semo in an emergency room, where medical personnel were

cutting his clothing from his body. As that was progressing, a bag of green material was discovered in Semo's crotch area. The officer seized the bag as containing suspected contraband. The seized substance was later analyzed by a forensic chemist with the Georgia Bureau of Investigation. Qualified at trial as an expert in drug identification, the forensic chemist opined that the analyzed substance was 19.34 grams of a Schedule I drug commonly known as a synthetic cannabinoid.

Several other law enforcement officers testified regarding the collision scene, as well as about various aspects of the exit ramp used by Semo and the circumstances of Interstate 185 on the night in question. The first state trooper to arrive at the scene at about 10:05 p.m. testified that, based on his investigation, he ascertained that "a red Toyota Rav4 traveling northbound in the inside lane . . . had been struck head on by a Toyota Sequoia near mile marker 40.9"; and that the latter vehicle, which was white in color, "had been traveling south in the northbound lanes." The trooper further ascertained that Semo, who was still being treated in an ambulance when the trooper arrived, had been the wrong-way driver.

The state trooper recounted at trial that the weather conditions on that night were clear and without fog, and that the pavement was dry. He testified that along that stretch of Interstate 185, the grassy median between the two southbound lanes and the

8

two northbound lanes was unobstructed, thus allowing for a view of the traffic flow from one side to the other.

The trooper detailed at trial the extensive signage set out all along the off ramp at Exit 46 (which Semo had used) to avert a driver from using that ramp to enter the expressway: e.g., a "Do Not Enter / Wrong Way" reflective sign posted where the off ramp joined the cross street so as to face a potential wrong-way driver; white stop bars painted all across the payment of the off ramp where it joined the cross street; a second "Do Not Enter / Wrong Way" reflective sign posted some distance along the ramp so as to face a wrong-way driver; and two "One Way" signs – one posted on either side of the ramp. Additionally along the exit ramp, the trooper explained at trial, were other visible indicators for a wrong-way driver: e.g., multiple traffic signs posted alongside the ramp (including a stop sign) that were facing *away* from the wrong-way driver; the customary yellow line painted on the ramp, but appearing on the wrong-way driver's right (as opposed to the left); and the customary white fog line and emergency lane, but appearing on the wrong-way driver's left (as opposed to the right). And at the point where the off ramp joined the edge of the interstate, the trooper further identified as a visible indicator, a wrong-way driver would have been "dumped straight into" interstate traffic (as opposed to being allotted a lane running

9

parallel to the interstate for approximately 200- to 300-feet so that the driver can build adequate speed to safely merge into the flow of interstate traffic). Then, after a wrong-way driver "merged" onto that stretch of Interstate 185, the trooper went on to explain at trial, numerous other indicators of wrong-way travel were plainly visible: e.g., the median lay to the right of the wrong-way driver (instead of to the left); and the flow of traffic across the median was traveling in the same direction as the wrong-way driver (as opposed to traveling in the opposite direction). The trooper also authenticated numerous pictures showing the general area, the mangled conditions of the SUVs, their resting positions, and various roadway evidence such as tire marks and payment gouges. Those pictures were admitted in evidence.

Another law enforcement officer, an accident reconstructionist for Georgia's Specialized Collision Reconstruction Team, qualified at trial to testify as an expert in collision reconstruction. He had served as the lead investigator of the collision, and detailed at trial the steps he had undertaken, which included interviewing witnesses, examining the collision scene, and inspecting the two SUVs. He testified that neither vehicle had any defect that could have caused the collision; that the red Rav4 was traveling at 73 miles per hour when the air bags deployed; and that both vehicles' front ends were "completely destroyed," which was consistent with a head-on

10

collision. The prosecutor's final question to this trial witness was whether he had reached a conclusion. The expert answered:

> The conclusion was that on May 21, 2015, at approximately 9:51 p.m., a traffic collision occurred on I-185 in the northbound lane between mile markers 40 and 41. A 2003 white Toyota Sequoia driven by Humphrey Semo was traveling southbound in a northbound lane. He struck head on with a 2015 red Toyota Rav4. . . .
>
> As a result of the collision, [two occupants of the red Rav4] sustained injuries that resulted in their death. And as a result of the same collision, [the third occupant of the red Rav4] received serious injury. His reckless act contributed to this collision and contributed to the death[s] of [two of the occupants] and to the serious injury of [the third occupant].

The State's final trial witness was the occupant of the red Rav4 who survived his crash injuries. He had been in the front passenger seat; his 31-year old cousin had been in the driver's seat; and his 48-year-old father had been in the back seat. They were traveling from Florida to spend time in Atlanta with other family members and friends. The surviving victim testified that his last memory about the night in question was that the three of them had stopped along the way at a supermarket, where they had laughed and joked together; his next memory was waking up in a hospital. He had no recollection of the collision. Describing his injuries, the victim testified,

11

My brain, my left brain was damaged. It was bleeding. Again, I remember nothing. My left arm was broken. . . . I couldn't do nothing with my left arm, my left shoulder. I broke my ribs from one to nine on the left side. My jaw was damaged. My spinal cord got damaged because the disc inside damaged my spinal cord. They had to remove it out of my body. They had to cut me on this side to take it. They had to remove the ribs and they had to cut me on this side to remove the disc out of my body. . . . [M]y jaw was broken. They had to do surgery on it. It was broken. . . . I have a chip (ph) right there. There was something wrong, so they had to put like a speaker thing for my voice to come out.

Additionally, he had lost the use of his legs.

Semo neither testified, nor called any witness. Regarding his defense, Semo's trial lawyer ended the closing argument with:

This was a horrible accident, a horrible accident. Two people lost their lives and a third's life is forever changed. By making one wrong turn and driving down the interstate, this happened. It's a mistake that could happen to anybody. It was dark, it was late at night, and it was an accident. And I ask that you find that it's an accident. Thank you.

Indeed, as Semo's trial lawyer would later confirm at the new trial hearing, the trial defense had been that Semo had not driven recklessly, but had "made a mistake. He just got on the interstate by accident."

12

As set out above, Semo argues on appeal that the trial court erred in rejecting his claim of ineffective assistance of trial counsel. To prevail on this claim,

> [Semo] must prove both deficient performance and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, [Semo] must show that his trial counsel performed in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, [Semo] must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. We need not address both components of this test if [Semo] has not proved one of them. See *Walker v. State*, 301 Ga. 482, 489 (801 SE2d 804) (2017).

*Watson v. State*, 303 Ga. 758, 761-762 (2) (d) (814 SE2d 396) (2018). "In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Wheeler v. State*, 290 Ga. 817, 820 (6) (725 SE2d 580) (2012). According to Semo, his trial counsel rendered ineffective assistance in three respects.

1. Semo contends that his trial lawyer "destroyed" his defense when cross-examining the state trooper. In particular, as Semo claims, "Counsel['s] asking a

13

question that he did not know the answer was deficient representation under *Strickland*."

Semo complains about a portion of the cross-examination that began with, "[Have you ever written] tickets for people going the wrong way?" The trooper replied, "Probably so. And the reason I say that is the wrong-way drivers I've dealt with over my career have either been intoxicated or had some kind of medical problem such as Alzheimer's, Dementia, something [like] that." The following cross examination ensued:

Q: So people couldn't just get mixed up on which way they're going on the road?
A: I would say it's possible for a very short distance but not six or seven miles.
Q: But this wasn't six or seven miles; right? It was from exit 46 until mile marker 41?
A: That's about five miles or six miles.
Q: Four and a half miles?
A: Five miles.

As Semo summarizes his complaint as to that portion of cross-examination:

Counsel . . . tried . . . asking [the trooper's] opinion whether some drivers get mixed up. This is where counsel asked questions he did not know the answer. [The trooper] answered that drivers can get mixed

14

up[,] but not for 6-7 miles. Counsel then argued with [the trooper] whether the distance [had been] that much[,] settling upon [the trooper's] answer of five miles.

(Internal record citations omitted.)

Semo acknowledges the principle that "[t]he scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." *Simpson v. State*, 277 Ga. 356, 359 (4) (b) (589 SE2d 90) (2003). However, he cites *Benham v. State*, 277 Ga. 516 (591 SE2d 824) (2004), wherein the Supreme Court of Georgia explained that "invoking the words 'tactics' and 'strategy' do[es] not automatically immunize trial counsel against a claim that a tactical decision or strategic maneuver was an unreasonable one no competent attorney would have made under the same circumstances." (Citation and punctuation omitted.) Id. at 518. According to Semo, the flagged portion of the trooper's cross-examination was not a reasonable employ of trial tactics and/or strategy. As Semo posits, the purpose of that cross-examination was to present evidence that he – as any other driver could potentially make – had merely made a mistake and turned the wrong way;[7] yet his

---

[7] At the new trial hearing, Semo's trial lawyer recalled that he had been trying to elicit testimony from the trooper that motorists sometimes drive the wrong way without being impaired in any way.

15

trial lawyer admittedly had not talked to the trooper before trial; and so his trial lawyer not only failed to obtain the desired answer, the lawyer brought out testimony that rendered his defense less viable. According to Semo, other than the cited unanticipated testimony from the trooper on cross-examination, "there is not much evidence to show that [he] was driving recklessly."

This ineffectiveness claim is unavailing, as Semo has not demonstrated requisite prejudice. It was already quite evident from the State's case that while a driver might initially attempt to use the off ramp from the cross street, an alert driver was unlikely to proceed. In particular, the trooper had detailed on direct examination the myriad of signage, as well as multiple other visible indicators all along the off ramp to avert a driver from using the off ramp to enter the expressway.

Furthermore, the convictions that Semo now contests were all premised upon "reckless driving" in that he drove southbound in a northbound lane of travel on Interstate 185 where the speed limit was 70 miles per hour.[8] Evincing those allegations, the State showed through numerous other witnesses and the trooper on direct examination that Semo was a wrong-way driver – not just in having turned onto the off ramp and taken it all the way to the expressway, but in continuing thereafter

_____

[8] See footnotes 1 - 3, supra.

16

– for about five miles on the expressway itself; that all the while, Semo bypassed a stream of "wrong-way" indicators – e. g., multiple vehicles approaching him from directly ahead; several of those vehicles (as well as another vehicle on the other side of the median and tracking Semo's vehicle) had horns honking and/or headlights flashing; and several of those oncoming vehicles swerved wildly just before they otherwise would have collided directly into Semo's vehicle. The evidence further showed that a grassy median and an emergency lane bordered Interstate 185 North, yet Semo continued driving in the travel lanes – unquestionably posing a dire threat to life and property – until he slammed into the front end of the northbound red Rav4.

Given that the jury was thus presented with overwhelming evidence that Semo was guilty of the crimes for which he was convicted (premised upon reckless driving), we find no reasonable probability that but for the complained-of portion of cross-examination, the outcome of his trial would have been different. Accord *Sullivan v. State*, 308 Ga. 772, 779-780 (2) (843 SE2d 411) (2020) (although there was slight evidence suggesting that the defendant's initial action of driving onto the off ramp was accidental, there was compelling evidence presented by the State that the defendant's driving thereafter was with requisite intent, including evidence that the defendant continued driving for approximately three miles at between 75 and 80

17

miles per hour, and meanwhile bypassed multiple warning signs, numerous places along the route where the defendant could have safely pulled her car onto the side of the road, as well as four motorists who had to swerve from their lanes to avoid a head-on collision with the defendant's vehicle). Nothing in *Tran v. State*, 340 Ga. App. 546 (798 SE2d 71) (2017), upon which Semo relies, provides for an outcome in his favor. The circumstances underlying that case are inapposite to those here. Id. at 558 (3) (finding merit in the ineffectiveness claim, where trial counsel's cross-examination "severely undercut" the defense, and where the evidence of the defendant's guilt was not overwhelming).

2. Semo claims that his trial counsel rendered ineffective assistance by failing to request a charge on second degree vehicular homicide, as a lesser-included offense of first degree vehicular homicide.[9]

---

[9] See OCGA § 40-6-393 (a) (defining first degree vehicular homicide as premised upon certain traffic offenses including reckless driving), (c) (defining second degree vehicular homicide as premised upon a violation of "any provision of this title other than" reckless driving and other specified acts); *O'Shields v. State*, 351 Ga. App. 800, 805-806 (2) (833 SE2d 290) (2019) (discussing rationale for determining that second degree vehicular homicide is a lesser included offense of first degree vehicular homicide, and reiterating that "a written request to instruct the jury on second degree vehicular homicide must be given in a case charging first degree vehicular homicide if there is any evidence showing that a less culpable traffic offense caused the fatal collision") (citation and punctuation omitted).

According to Semo, his trial lawyer should have sought such a charge on grounds that the predicate traffic offense for the vehicular homicide counts was *not* reckless driving, but merely improper driving upon a divided highway.[10] As Semo posits,

> Driving on a divided highway is defined under OCGA § 40-6-50[11] as "[e]very vehicle driven on a divided highway shall be driven only upon the right-hand roadway" and "[n]o person shall drive a vehicle onto or

---

[10] See *O'Shields*, 351 Ga. App. at 806 (2) (concluding that the defendant was entitled to a jury instruction on second-degree vehicular homicide as a lesser included offense of first-degree vehicular homicide, where there was testimony that the defendant was speeding and following too closely at the time of the accident, and where the jury could have found those less culpable offenses – rather than the DUI – caused the fatal accident).

[11] OCGA § 40-6-50 (b) provides,

Every vehicle driven on a divided highway shall be driven only upon the right-hand roadway unless directed or permitted to use another roadway by official traffic-control devices or police officers. No vehicle shall be driven over, across, or within any dividing space, barrier, gore, paved shoulder, or section separating the roadways of a divided highway; except that a vehicle may be driven through an opening in such physical barrier or dividing space or at an established crossover or intersection unless specifically prohibited by an official sign, signal, or control device. No person shall drive a vehicle onto or from any controlled-access roadway except at such entrances and exits as are established by public authority. Except as provided for in subsection (c) of this Code section, no vehicle shall be driven in an emergency lane except in the event of an actual emergency.

from any controlled-access roadway except at such entrances and exits as are established by public authority."

We find no merit in this ineffectiveness claim. Even assuming arguendo that Semo's trial lawyer rendered deficient performance as claimed here, Semo has failed to demonstrate requisite prejudice. As detailed above, both counts of first degree vehicular homicide were premised upon allegations of "reckless driving" that pertained to the manner in which Semo drove his vehicle along Interstate 185. "[R]eckless driving" occurs when a person drives a vehicle "in reckless disregard *for the safety of persons or property*." (Emphasis supplied.) OCGA § 40-6-390 (a). See *Winston v. State*, 270 Ga. App. 664, 665 (1) (a) (607 SE2d 147) (2004) (reciting that while "the offense of reckless driving may be committed in a variety of ways, the State needed . . . to present evidence showing that [the appellant] drove her car in a manner exhibiting reckless disregard for the safety of persons or property").

By all accounts put before the jury, after accessing the interstate highway via an off ramp, Semo drove southbound on Interstate 185 North; and despite the plethora of signage and other plain indicators that he was driving the wrong way, Semo proceeded for several miles at approximately 65 - 70 miles per hour directly into oncoming traffic traveling at about that same speed. There was no evidence that

20

Semo's manner of driving was due to some vehicle malfunction, inclement weather, or poor road condition; there was no evidence that Semo attempted either to pull out of the interstate travel lanes (and into the emergency shoulder lane or even the grassy median) or to otherwise avoid a head-on collision. Semo's continued manner of driving caused motorists to flash headlights, honk horns, blare a fog horn, swerve wildly, and veer into a ditch. His manner of driving caused individuals to call 911 and report immediately the ongoing perilous danger. Semo's manner of driving, which was at night, afforded little to no opportunity for oncoming drivers to ascribe meaning to unexpected, fast-approaching "headlights," and to then quickly maneuver out of Semo's unyielding path. Semo's manner of driving ended with a head-on collision that left two individuals dead at the scene.

Given the foregoing, we conclude that the evidence overwhelmingly showed both that Semo was guilty of reckless driving (and not merely of failure to drive "only upon the right-hand roadway") and that his reckless driving caused the deaths of two occupants of the red Rav4. We thus find no reasonable probability that had the jury been charged as Semo maintains here, the outcome of his trial would have been different. See generally *Wright v. State*, 304 Ga. App. 651, 653 (2) (697 SE2d 296) (2010) (crossing centerline and driving into oncoming traffic near a dangerous

21

intersection was evidence of reckless driving); *Morrison v. State*, 272 Ga. App. 34, 41 (5) (611 SE2d 720) (2005) (crossing centerline was evidence of reckless driving), overruled in part on other grounds, *State v. Slaughter*, 289 Ga. 344, 346, n. 4 (711 SE2d 651) (2011); *Boone v. State*, 229 Ga. App. 379, 381 (7) (494 SE2d 100) (1997) (finding that the defendant committed reckless driving when, while driving his vehicle, he forced two other cars off the interstate); *Duggan v. State*, 225 Ga. App. 291, 294 (1) (483 SE2d 373) (1997) (affirming conviction for vehicular homicide based on reckless driving, where evidence showed that after consuming alcohol, the defendant "drove at speeds of 20 to 25 miles over the speed limit and attempted to pass another vehicle on a sharp downhill curve, but was unable to stay in his lane").

3. Semo claims that his trial counsel rendered ineffective assistance by failing to object to the State's collision-reconstruction expert's opinion about an element of a charged crime. In particular, Semo cites that when the expert was asked for his conclusion about the collision, the expert included in his answer, "[Semo's] reckless act contributed to this collision and contributed to the death[s] of [two of the occupants] and to the serious injury of [the third occupant]." Relying on OCGA § 24-

22

7-704 (b),[12] Semo complains that his trial lawyer lodged no objection to the expert's characterization of his act as "reckless."

Without deciding whether the contested testimony was impermissible under the cited Code provision, we find this ineffectiveness contention unavailing. Given the overwhelming evidence that was properly admitted at trial showing that Semo was guilty of reckless driving and that such traffic offense caused the fatal and catastrophic injuries sustained by the three occupants of the red Rav4, Semo has failed to demonstrate that, but for his trial lawyer's failure to object as complained of here, the outcome of his trial would have been different. See *Fouts v. State*, 322 Ga. App. 261, 267 (4) (a) (744 SE2d 451) (2013) (concluding that the defendant failed to establish that prejudice resulted from trial counsel's failure to object to the

_____

[12] OCGA § 24-7-704 provides in full,

(a) Except as provided in subsection (b) of this Code section, testimony in the form of an opinion or inference otherwise admissible shall not be objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of an accused in a criminal proceeding shall state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

troopers' testimony that the collision was caused by the defendant's reckless driving, where the undisputed evidence – that the defendant drove into the opposite lane of travel, that the defendant collided head-on with an oncoming vehicle, and that the driver of the other vehicle died at the scene – supported her conviction of vehicular homicide in the first degree) ; see generally *Wright*, 304 Ga. App. at 653 (2); *Morrison*, 272 Ga. App. at 41 (5); *Boone*, 229 Ga. App. at 381 (7); *Duggan*, 225 Ga. App. at 294 (1).

4. Finally, we conclude that the cumulative prejudice from any assumed deficiencies discussed in the above Divisions is insufficient to show a reasonable probability that the results of the underlying proceeding would have been different in the absence of the alleged deficiencies. See generally *Jones v. State*, 305 Ga. 750, 757 (4) (e) (827 SE2d 879) (2019).

*Judgment affirmed. Gobeil and Pipkin, JJ., concur*.